480 S.E.2d 801

Belinda CONRAD, Plaintiff
Below, Appellant,

v.

ARA SZABO, The West Virginia Regional
Jail and Correctional Facility Authority
and Edward Rudloff, Defendants Below,
Appellees.

No. 23304.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 25, 1996.

Decided Dec. 5, 1996.

Harley O. Staggers, Jr., Staggers & Staggers, Martinsburg, for Appellant.

Cheryl H. Wolfe, Christopher K. Robertson, Jackson & Kelly Martinsburg, for Appellee ARA Szabo.

Charles F. Printz, Jr., Kimberly S. Croyle, Bowles, Rice, McDavid, Graff & Love, Martinsburg, for Appellees West Virginia Re-

CLECKLEY, Justice:

Plaintiff Belinda Conrad appeals the orders of the Circuit Court of Berkeley County granting motions to dismiss the West Virginia Regional Jail and Correctional Facility Authority and Edward Rudloff under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure, and an order granting summary judgment to ARA Szabo, respectively, in this action alleging violations of the West Virginia Human Rights Act. For the reasons stated, we reverse in part, and affirm in part.[1]

I.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Belinda Conrad was hired by Canteen Corporation in September, 1991, to work as a cook supervisor[2] in the kitchen at the Eastern Regional Jail (the Jail). In August, 1992, ARA Szabo Services, Inc. (ARA Szabo) took over the Jail's food services contract from Canteen Corporation. During the transition period, Sharon Kees, the kitchen manager and supervisor to the plaintiff, was told by ARA Szabo district manager Dennis Hatcher that the Jail did not want ARA Szabo to hire the plaintiff. Ms. Kees, however, expressed her belief that the plaintiff was a good worker, and she was subsequently allowed to retain plaintiff as an employee.

Prior to the defendant ARA Szabo taking over the food services contract, Ms. Kees informed Mr. Hatcher that the plaintiff had been the subject of harassment by Jail employees. At a meeting with Ms. Kees and the plaintiff before the changeover, Mr. Hatcher stated that the Jail administration did not want the plaintiff to be hired by ARA Szabo because it felt she was not qualified for

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

2. Plaintiff testified that her job involved supervising inmate trustees in cooking and preparing meals.

her job. However, according to the plaintiff's testimony, Mr. Hatcher told the plaintiff that he would "straighten the matter out" and that he would not tolerate sexual harassment of any kind.

The plaintiff testified that harassing behavior directed at her by Jail employees increased after ARA Szabo assumed control of the kitchen. She testified that several incidents of a sexual nature occurred. For instance, a Corrections Officer Franklin often "groped" himself in the genital area while talking with the plaintiff. According to the plaintiff, each time he did this she told him to stop and he responded by commenting, "You like it when I do this," or by asking her if she "wanted some of that." The plaintiff testified that he also told her Officer Franklin would meet her wherever she chose and he would show her what a "real man" could do for her. A couple of times Officer Franklin came to the kitchen to get dinner and made comments such as, "Let's you and me go do the nasty." On one occasion, Officer Franklin asked her specifically to meet him to "make love all night" at the substation of the fire department for which they both volunteered. The plaintiff testified that she responded by telling him that he repulsed her. She reported Officer Franklin's behavior to her supervisor, Ms. Kees.

In approximately March, 1993, during a bad snowstorm, a corrections officer by the name of Broadus was asked by the Jail watch commander to drive the plaintiff home after her shift. The plaintiff testified that Broadus drove her home in a van belonging to the Jail and when they had almost reached her house he said, "What's to stop me from pulling the van over and giving you what I know you want?" The plaintiff stated that she was shocked by the officer's question and demanded to be let out of the van immediately. The plaintiff complained to her supervisor the next day and filled out an incident report.[3] She specifically asked her supervisor a few days later to speak with Jail Administrator Jerry Dietrick about the incident. Plaintiff also asserted that on an occasion when she was making a sandwich at a table

in the kitchen, an Officer Castaldo, with several witnesses present, approached her from behind, pushed her into the table with his whole body against hers and whispered, "That feels good."

The plaintiff also complained of several incidents of non-sexual behavior by Jail employees. Several times a Sergeant Ward delivered the inmate trustees late for breakfast preparation, which resulted in breakfast being served late on the plaintiff's shift. On the morning of January 31, 1992, Sergeant Ward and another officer would not open the security door for the plaintiff when she arrived at work, and she was forced to wait five to seven minutes until someone else noticed her and let her in. On at least one occasion, Sergeant Ward ordered the plaintiff to break kitchen rules and allow his trustees to eat more food than they were entitled. There were times when Jail employees did not respond to the plaintiff's call to lock the kitchen at the end of her shift. The plaintiff testified that several officers called her "bitch." On another occasion, as the plaintiff was serving lunch to some of the officers, Chief Correctional Officer Lt. Edward Rudloff agreed with another officer that the Jail was "no place for a girl" to work.

The plaintiff reported many of the incidents in question to her immediate supervisor, Sharon Kees. Although ARA Szabo had a sexual harassment procedure in place, it is not clear whether Ms. Kees characterized the conduct as sexual harassment when she discussed it with her supervisor, Dennis Hatcher. The plaintiff alleges that she discussed the harassing behavior with ARA Szabo District Manager James Skinner, who replaced Dennis Hatcher in 1992.

On June 8, 1993, Officer Castaldo heard the plaintiff using profanity in the presence of inmates and reported the incident to Jail management. Although this was a violation of ARA Szabo's written security policy, punishable by discharge from employment, the plaintiff received a verbal warning from her supervisor, Ms. Kees. On June 10, 1993, Chief Corrections Officer Lt. Rudloff wrote a letter to Szabo District Manager James Skin-

---

**3.** The plaintiff testified that this incident report, addressed to Sharon Kees, has disappeared along with some others which she remembers completing.

ner, requesting that the plaintiff be dismissed. Mr. Skinner consulted with ARA Szabo's Human Resource Director, Beth Tarter, and, based upon Lt. Rudloff's recommendation, terminated the plaintiff. The plaintiff alleges the termination resulted because she complained about being harassed. The plaintiff also asserts that in the telephone conversation in which she was told of her termination of employment, Beth Tarter stated that she would find the plaintiff another job within the company, but that Ms. Tarter did not offer the plaintiff a position at any time after that.

On August 29, 1994, the plaintiff filed a complaint against ARA Szabo, the West Virginia Regional Jail and Correctional Facility Authority (the Authority), and Edward Rudloff in the Circuit Court of Berkeley County alleging sexual discrimination under W.Va. Code 5–11–9(1) (1992), reprisal and conspiracy under W.Va.Code 5–11–9(7) (1992), and breach of contract for not following through with a promise of new employment with the company.

On June 15, 1995, and June 16, 1995, respectively, the Authority and Edward Rudloff moved for dismissal of the complaint against them under Rule 12(b)(6). On July 18, 1995, ARA Szabo filed a motion for summary judgment.

On July 18, 1995, the circuit court issued an order dismissing the Authority from the suit. On the same date the court dismissed Count I of the complaint against Edward Rudloff. On October 30, 1995, the Court issued an order stating that it had made a clerical mistake in its July 18, 1995, order concerning Edward Rudloff, and amended that order to dismiss him as a party defendant in the case.

On October 30, 1995, the circuit court issued an order granting defendant ARA Szabo's motion for summary judgment. The plaintiff appeals from that order and from the orders dismissing defendants Edward Rudloff and the Authority from the suit.

## II.

## DISCUSSION

Turning to the appeal before us, the plaintiff raises three issues to be decided: (1) whether the record created a viable claim against ARA Szabo for sexual harassment under W. Va.Code 5–11–9(1); (2) whether the record created a viable claim against ARA Szabo for retaliatory discharge under W. Va. Code 5–11–9(7); and (3) whether the complaint stated a claim for relief against the Jail Authority or Lt. Rudloff under either W. Va.Code § 5–11–9(1) or § 5–11–9(7). The contentions raised on appeal require us again to scrutinize the structure, language and policy of the West Virginia Human Rights Act. In doing so, and after careful examination of the record, the briefs, and the applicable law, we hold that the Circuit Court was wrong in dismissing this action against the Authority, in dismissing the sexual discrimination count under W. Va.Code § 5–11–9(7) against Edward Rudloff, and in granting summary judgment to ARA Szabo. For ease in explanation, we divide our analysis into moieties.

### A.

### *Standard of Review*

We exercise plenary review over a circuit court's decision to grant either a motion to dismiss or a summary judgment. Syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995) (This Court reviews *de novo* a circuit court's order granting a motion to dismiss a complaint); Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo* "). In determining whether a motion to dismiss or a summary judgment is appropriate, we apply the same test that the circuit court should have applied initially. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292, 299 (1978); *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995). We are not wed, therefore, to the lower court's rationale, but may rule on any alternate ground manifest in the record.

In reviewing a motion to dismiss, this Court is required to accept all the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Murphy v. Smallridge,* 196

W.Va. 35, 36, 468 S.E.2d 167, 168 (1996). A complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Syl. pt. 3, in part, *Chapman v. Kane Transfer Co., Inc.*, 160 W.Va. 530, 236 S.E.2d 207 (1977), *citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).

■ A motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." W. Va. R. Civ. P. 56(c). A fact is material if it could affect the outcome of the dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986); *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). The task of a court at the summary judgment stage is "not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at 212. Thus, we must resolve all reasonable doubts in favor of the non-moving party. In other words, for a grant of summary judgment to be proper, the moving party must show that there is an absence of evidence to support the non-moving party's case and a determination that the evidence is so one-sided that one party must prevail as a matter of law. These principles apply whether summary judgment is granted on the merits of a claim or on an affirmative defense.

■ In *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995), we cautioned circuit courts to be particularly careful in granting summary judgment in employment discrimination cases. Although we refuse to hold that simply because motive is involved that summary judgment is unavailable, the issue of discriminatory animus is generally a question of fact for the trier of fact, especially where a prima facie case exists. The issue

does not become a question of law unless only one conclusion could be drawn from the record in the case. In an employment discrimination context, the employer must persuade the court that even if all of the inferences that could reasonably be drawn from the evidentiary materials of the record were viewed in the light most favorable to the employee, no reasonable jury could find for the plaintiff. Because the record in this case could lead a rational trier of fact to find for the plaintiff on several claims, summary judgment was inappropriate.

### B.

#### *Sexual Harassment*

■ The West Virginia Human Rights Act, as well as Title VII, imposes on employers a duty to ensure, as best they can, that their workplaces are free of sexual harassment that creates a hostile or offensive working environment. *Hanlon, supra; see also Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132, 153 (1989); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 58 (1986). As the United States Supreme Court recognized in *Meritor*, "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. This Court has recognized sexual harassment as an independent basis for stating a Human Rights Act claim. *Hanlon*, 195 W.Va. at 106–08, 464 S.E.2d at 748–50; *Westmoreland Coal Co. v. West Virginia Human Rights Comm'n*, 181 W.Va. 368, 382 S.E.2d 562 (1989).

■ The plaintiff's complaint alleged hostile environment sexual harassment.[4] "An employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of

---

4. This Court has recognized two forms of sexual harassment in the workplace. The first, alleged in this case, involves an employee who is consistently subjected to sexual innuendo or contact, or dirty tricks aimed at the employee because of her gender, thereby creating a hostile environment

for employment. The second, *quid pro quo* sexual harassment, involves an employer or its agent demanding sexual consideration in exchange for job benefits. *Westmoreland Coal, supra; Hanlon, supra.*

unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment." Syl. pt. 7, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995). In order to determine whether the plaintiff should have survived a summary judgment motion, we must determine whether she has adduced sufficient facts to create an inference [5] that she experienced a hostile or abusive work environment because of actionable sexual harassment.

The lower court found that the treatment plaintiff complained of fell into two distinct categories: conduct of a sexual nature and conduct of a non-sexual nature. The court first examined the conduct that it characterized as of a non-sexual nature, such incidents as guards failing to let the plaintiff into the Jail when she arrived in the morning, delivering inmate trustees to the kitchen late for breakfast, failing to appear to lock up the kitchen at the end of the plaintiff's shift, and ordering her to give inmate trustees more food than ARA Szabo rules allowed. The court, citing W. Va.C.S.R. § 77–4–2.5, concluded that non-sexual conduct constitutes sexual harassment only if it is "hostile or physically aggressive behavior" based upon the sex of the recipient. We said in *Hanlon* that hostile environment sexual harassment can occur "when the workplace is infected, for example, by sexual barbs or innuendos, offensive touching, or dirty tricks aimed at the employee because of her gender." 195 W.Va. at 107, 464 S.E.2d at 749. If the circuit court meant that the nonsexual conduct could not amount to harassment unless it consisted of some physical or threat-

ened assault, then the court erred. Rather, the key inquiries are whether the mistreatment was directed at the plaintiff because she was a woman *and* whether it was of such a nature, because of its seriousness or its pervasiveness, as to ruin the working environment for the plaintiff. (We elaborate on that concept below.) "Hostility" in these cases does not depend on the putative conduct's aggressiveness quotient (although that is relevant); rather, it turns on what effect the conduct would have, cumulatively, on a reasonable person. As we develop below, we believe that a reasonable factfinder could determine that the cumulative effect of the conduct in this case could have created a hostile environment for the plaintiff.

The court further found that the conduct it labeled as non-sexual in nature was neither hostile nor based upon the plaintiff's gender because other women working at the Jail Authority were not similarly "ill-treated." Plaintiff did testify in her first deposition that the other women employees were not sexually harassed. Hostile conduct, or its absence, directed toward other members of the plaintiff's group may be relevant in determining the existence of a hostile environment. In *State ex rel. Tinsman v. Hott*, 188 W.Va. 349, 353, 424 S.E.2d 584, 588 (1992), this Court stated that sexual harassment of co-workers who were simultaneously employed with the complainant would be relevant to show a sexually hostile work environment.[6] Contrary to the lower court's conclusion, however, there is evidence in the record that two other female employees who were employed at the Jail concurrently with the plaintiff filed sexual harassment com-

**5.** "Although the plaintiff has the ultimate burden of proving elements of the claim of discrimination by a preponderance of the evidence, the showing the plaintiff must make as to the elements of the *prima facie* case in order to defeat a motion for summary judgment is *de minimis*. In determining whether the plaintiff has met the *de minimis* initial burden of showing circumstances giving rise to an inference of discrimination, the function of the circuit court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It

is not the province of the circuit court itself to decide what inferences should be drawn." Syl. pt. 4, *Hanlon, supra*.

**6.** We explained in *Tinsman*, "When the question of whether incidents of sexual harassment directed at other employees could be used as evidence in the plaintiff's claim of a hostile work environment . . . , '[t]he answer seems clear: one of the critical inquiries in a hostile environment claim must be the *environment*.'" 188 W.Va. at 352, 424 S.E.2d at 587 (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987) (emphasis in *Tinsman*).

plaints against the Jail Authority.[7]

■ Yet, even if there were no such evidence, and conceding that its absence may be relevant, we do not think that fact is dispositive. *See O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438 (1996). That no other women in the workplace had complained would not preclude plaintiff's sexual harassment claim. Women may become sexual harassment targets for a variety of factors—*e.g.,* their age, personality, vulnerability, demeanor, physical appearance, or the proclivities of their harassers. But in every such case, an operative fact is the woman's sex; it is a "but for" for the harassment. Whether the discrimination in such cases, where one or several women are harassed while other women are not, is characterized as "mixed motive" discrimination, *see, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or "sex plus" discrimination, *see, e.g., Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), or just plain "sex" discrimination, *see, e.g., Frank's Shoe Store v. West Virginia Human Rights Comm'n,* 179 W.Va. 53, 365 S.E.2d 251 (1986); *see also* Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), it is nonetheless discrimination that violates the Human Rights Act.

■ Finally, the circuit court found that the sexual conduct complained of by the plaintiff was not sexual harassment because it was isolated in nature, with no physical contact, and it was neither pervasive nor severe. Such incidents, however, cannot be viewed in isolation of the mistreatment that did not have an overt sexual component. Rather, the plaintiff's environment must be considered under all the circumstances, taken as a whole. *E.g., Meritor Sav. Bank,* 477 U.S. at 69, 106 S.Ct. at 2406, 91 L.Ed.2d at 61. The proper inquiry is as follows:

"To establish a claim for sexual harassment under the West Virginia Human Rights Act, W. Va.Code § 5–11–1, *et seq.,* based upon a hostile or abusive work environment, a plaintiff-employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Syl. pt. 5, *Hanlon, supra.*

We address each of those elements, in turn.

■ "In order to constitute harassment, this conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson v. City of Dundee,* 682 F.2d 897, 903 (11th Cir.1982). A rational finder of fact could infer from the evidence that the conduct directed toward plaintiff was unwelcome. Her dismissive and derisive responses to the overtly sexual advances were sufficient, standing alone, to establish that element for summary judgment purposes. In addition, there is evidence that she complained about her mistreatment to her superiors. It is at least reasonable to assume that one does not complain about treatment that one finds agreeable. Moreover, there is nothing in the record to indicate that the plaintiff "welcomed" the nonsexual misdeeds that she described.

Next, the plaintiff must have adduced evidence to show that but for the fact of her sex, she would not have been the object of harassment. 682 F.2d at 904. Here, the sexual content of the offensive overtures that were made to her indicate she was singled out because of her sex, and that content, combined with her rejection of the overtures, create at least an inference that the other incidents befell her because of her sex.[8] Absent evidence that male employees were so-

---

7. "By its very nature, sexual harassment rarely occurs in plain view, and victims of sexual harassment, fearing reprisals, are reluctant to disclose it." *Gino's Pizza of West Hamlin, Inc. v. West Virginia Human Rights Commission,* 187 W.Va. 312, 317, 418 S.E.2d 758, 763 (1992).

The plaintiff's lack of awareness of others not being harassed is a normal phenomenon.

8. The discussion above, regarding the presence or absence of harassment complaints from other women, would also be relevant here.

licited for sex and endured harassment similar to that which the plaintiff experienced, the record provides a sufficient basis for a reasonable factfinder to conclude that, but for her sex, she would not have been subjected to the harassment. 682 F.2d at 904.

Third, the plaintiff must prove that the subject conduct was sufficiently severe or pervasive to alter her conditions of employment and create an abusive work environment. "Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances. 29 C.F.R. 1604.11(b)(1981)." 682 F.2d at 904. The plaintiff testified she felt that she could not perform her job as well as she would have if she had not been subjected to constant harassment. She testified to frequent intimidating and uncooperative behavior, unwelcome sexual advances, unwelcome sexual talk, or taunting by several officers. There is evidence that an officer entrusted by the Jail watch commander to drive the plaintiff home during a snowstorm spoke to the plaintiff in a threatening manner about his desire to have sex with her. Another officer repeatedly, and against the plaintiff's objections, grabbed his genital area and unzipped and rezipped his pants while he spoke with the plaintiff. The plaintiff was repeatedly ordered by an officer to break kitchen rules to provide coffee and extra food to inmates under his supervision. There is evidence, too, that the plaintiff frequently complained to Ms. Kees about being the object of adverse treatment. The frequency of the complaints reflects that the alleged harassment was ongoing and having an effect on the plaintiff. She also testified that, since leaving her position with ARA Szabo, she got a new job at another jail and that, as a result of her experience at the Eastern Regional Jail, she has often suffered anxiety attacks before going in to work in the morning. A rational trier of fact could infer from this evidence, as well as other evidence of the environment at the Eastern Regional Jail, that the harassing behavior was severe and pervasive enough to alter the plaintiff's conditions of employment.

The final element necessary to establish a prima facie case of sexual harassment is whether the conduct can be imputed on some factual basis to the employer. Although "the Human Rights Act imposes a duty on employers in this State to ensure that workplaces are free of sexual harassment from whatever source," *Hanlon,* 195 W.Va. at 108, 464 S.E.2d at 750, an employer's liability in a case where the source of the harassment does not include management personnel depends on its knowledge of the offending conduct, the effectiveness of its remedial procedures, and the adequacy of its response. An employer with effective guidelines for prohibiting and dealing with sexual harassment is not liable unless the employer had knowledge of the misconduct or reason to know of the misconduct. 195 W.Va. at 108, 464 S.E.2d at 750. The lower court did find that the plaintiff reported many of the incidents to her immediate supervisor, Ms. Kees, but concluded that Ms. Kees did not characterize the conduct against plaintiff as sexual harassment when discussing it with her supervisor. Therefore, the court held that ARA Szabo did not have knowledge of sexual harassment against the plaintiff.

Our review of the record finds the evidence is conflicting. The defendant ARA Szabo asserts that it did not have any knowledge of harassment allegations, and the plaintiff asserts that she informed management personnel. Specifically, she testified that an ARA Szabo manager told her upon hiring her that he knew of the harassing behavior against her and that he would not tolerate sexual harassment of any kind. Plaintiff testified, too, that she spoke to her supervisor's manager about the sexual harassment. Moreover, to the extent plaintiff complained about the sexually loaded remarks and touching, the employer's awareness of the gender basis for the harassment could be reasonably inferred. In addition, "[k]nowledge of work place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with ... [the West Virginia Human Rights Act] would be aware of the conduct." *Hanlon,*

195 W.Va. at 108 n. 9, 464 S.E.2d at 750 n. 9, *quoting Spicer v. Commonwealth of Virginia,* 66 F.3d 705, 710 (4th Cir.1995) (*en banc*). A jury could have found, from the evidence presented, that a reasonable employer would have been aware of the conduct in question. The issue of the employer's knowledge, either actual or imputed, is therefore a factual issue to be determined by the trier of fact. We also believe the adequacy of ARA's complaint procedures for responding to harassment is another material fact in dispute.

■ The court must consider all exhibits and affidavits and other matters submitted by both parties on a motion for summary judgment under Rule 56 of the West Virginia Rules of Civil Procedure. Syl. pt. 3, *Haga v. King Coal Chevrolet Company,* 151 W.Va. 125, 150 S.E.2d 599 (1966). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2nd Cir.1994). We find that the plaintiff's allegations and evidence establish a prima facie showing of hostile environment sexual harassment. Therefore, we find that the trial court erred in granting summary judgment to defendant ARA Szabo.

### C.

### *ARA Szabo's Liability for Retaliation*

■ Plaintiff alleged in her complaint that she was terminated in retaliation for complaining about harassment and discrimination against her at work. According to the plaintiff, her complaints amounted to "oppos[ition to] ... practices or acts forbidden" by the Human Rights Act, W. Va.Code 5–11–9(7), and were, therefore, a protected activity

under that section. She also alleged that the defendants engaged in acts of reprisal and conspired to harass, degrade, embarrass, and cause her economic loss.[9] The lower court found that because there was no sexual harassment, there was no "protected activity" to retaliate against. It further found that if the plaintiff's complaints could be construed as protected activity, they did not take place in close enough proximity to her termination to support an inference of retaliatory motivation.

■ We have described the elements of a retaliation claim:

" ' "In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, *W. Va.Code,* 5–11–1, *et seq.,* as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation." Syl. pt. 4, *Frank's Shoe Store v. West Virginia Human Rights Commission,* 179 W.Va. 53, 365 S.E.2d 251 (1986).' Syl. pt. 1, *Brammer v. Human Rights Commission,* 183 W.Va. 108, 394 S.E.2d 340 (1990)." Syl. pt. 10, *Hanlon, supra.*

■ In light of our decision in *Hanlon,* we need not dwell long on whether the plaintiff stated a *prima facie* case. She did. Under *Hanlon,* "protected activity" includes opposition to conduct that the plaintiff reasonably and in good faith believes violates the provisions of the Human Rights Act. This

---

9. W.Va.Code 5–11–9(7) (1992), makes it unlawful:

"(7) For any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to:

(A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or

economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section;

...

(C) Engage in any form of reprisal or otherwise discriminate against any person because he has opposed any practices or acts forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article."

standard has "both an objective and a subjective element. The employee's opposition must be reasonable in the sense that it must be based on a set of facts and a legal theory that are plausible. Further, the view must be honestly held and be more than a cover for troublemaking." 195 W.Va. at 112, 464 S.E.2d at 754. Thus, even if the circuit court was correct that there was no actionable sexual harassment, the plaintiff could still have been engaged in a protected activity if she complained about being sexually harassed. As we explained in *Hanlon:*

"The legislative purpose in including the anti-retaliation provision was obviously to encourage people to come forward and expose unlawful employment practices and to do so without fear of reprisal. By protecting reasonable, good faith opposition, the provision also advances the statutory purpose of ending discrimination by engaging private citizens to help serve as 'private attorneys general.' An absence of such protection would create a chilling effect on employees' willingness to join the fight. The overriding purposes of W. Va.Code 5–11–9(7)(C), would be wholly defeated if its protection applied only to those individuals who confidently know the technical area of fair employment law and who correctly predict how its doctrine will ultimately be applied in a court of law. Given those unpredictable variables, few rational employees would take much solace in the protection from retaliation offered by such a narrow construction of W. Va.Code, 5–11–9(7)(C).

"... [I]n hostile environment harassment cases (sexual, racial, or whatever), the offensive conduct often does not rise to the level of actionability until after there has been a significant accumulation of incidents. Both employees and employers would benefit from a standard that encourages harassed employees to come forward early, well before the ephemeral line of legal liability has been crossed, in order to root out the problem before it grows into an unmanageable and costly crisis." 195 W.Va. at 112, 464 S.E.2d at 754.

The second element of the *prima facie* case, the employer's knowledge of the plaintiff's exercise of a protected activity, follows easily in this case if she prevails in proving her contentions that she complained to her supervisor on several occasions. Obviously, if her protests about Human Rights violations (even if she did not expressly invoke the name of the statute) were made to her employer, then it necessarily follows that the employer knew about her protected activities. As to the third element of the *prima facie* case, it is uncontested that the plaintiff was discharged.

Thus, as frequently occurs in such cases, the main issue is whether there was sufficient evidence from which to infer some linkage between the protected activities and the discharge. Typically, though not necessarily, the inference arises from a temporal proximity between the two, and this is one of those typical cases. If plaintiff's evidence is believed and construed most favorably to her, then her complaints were ongoing and continued up to her discharge. Thus, an inference arises that the discharge resulted from the employer's desire to relieve itself of a complainer (about sexual harassment) and, perhaps, to solve the harassment problem by removing the victim.

The inference thus raised, ARA Szabo responded with the explanation that it discharged the plaintiff because it was requested to do so by the Regional Jail Authority, who was upset that plaintiff was overheard swearing in front of inmates. That is, indeed, a legitimate, nondiscriminatory reason, which could defeat the plaintiff's evidence. But there is an issue of fact here, and plaintiff is entitled to a chance to prove that ARA Szabo seized the opportunity to get rid of a protestor or knowingly [10] went along with the Jail Authority to retaliate against her. To support that contention, plaintiff could point to the fact that ARA Szabo did not originally perceive the swearing to be that serious. Conversely, ARA Szabo can argue a different inference: *i.e.,* that if ARA were really wait-

---

**10.** If the Jail Authority had an illicit motive in seeking the plaintiff's discharge but ARA Szabo lacked knowledge of that motive, and had no illicit motive of its own, we do not see any basis for holding it liable under the Human Rights Act.

ing for an opportunity to get rid of the plaintiff, it could have used the swearing incident as an excuse. Thus, it was only the letter from Lt. Rudloff that provoked the discharge. Plaintiff could respond by pointing to the fact that swearing in a jail would not be an unusual event and was, therefore, not a real opportunity to get rid of her. That there are different conclusions to be drawn simply reenforces our conclusion that there are issues of fact that can only be resolved after a trial.

## D.

### Dismissal of Jail Authority and Edward Rudloff

The circuit court found that the Jail Authority was not liable under W. Va.Code § 5–11–9(1) because "it was not Plaintiff's employer" and that it was not liable under W. Va.Code § 5–11–9(7) because "it is not an entity subject to liability for unlawful discrimination under that statute." The court also dismissed Edward Rudloff from the case. The court dismissed him first from the cause of action alleging discrimination under W. Va.Code § 5–11–9(1) "because he was not Plaintiff's employer," and later, under a separate order, dismissed the entire case against him, stating that the earlier order had contained a clerical error. We can only assume that the court used the same reasoning for the second cause of action as it did for the Jail Authority, that is, that Lt. Rudloff was not subject to liability for unlawful discrimination under W. Va.Code § 5–11–9(7).

We approach these issues fully cognizant of W. Va.Code § 5–11–15 (1967), which provides that the West Virginia Human Rights Act "shall be liberally construed to accomplish its objectives and purposes." [11] With that in mind, we consider, first, whether either the Jail Authority or Lt. Rudloff can be

held liable to the plaintiff under § 5–11–9(1). That provision makes it an unlawful employment practice "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment...." "Employer" is defined in § 5–11–3(d) (1992) as meaning "the state, or any political subdivision thereof, and any person employing twelve or more persons within the state[.]"

■■■ The Authority and Lt. Rudloff contend that § 5–11–9(1) reaches only discrimination by an employer against its employees or applicants for employment. Thus, the two defendants argue, they cannot be liable to the plaintiff under that section because they were not her employer; rather, she was paid for and supervised by ARA Szabo. We have to agree that the plaintiff was employed by ARA Szabo. The plaintiff counters, however, that both the Authority and Lt. Rudloff were "employers" within the meaning of § 5–11–3(d) and that they discriminated against the plaintiff—an "individual"—"with respect to ... [the] terms, conditions or privileges of [her] employment" by creating, or at least permitting, a sexually hostile working environment and by effecting her termination. In other words, the plaintiff argues that § 5–11–9(1) prohibits any person who is an employer from discriminating against any "individual" regarding his or her employment opportunities irrespective of whether the individual is an employee of that employer.

■■■ Both of those interpretations are reasonable. We note at the outset, however, that neither can sustain an action against Lt. Rudloff. He was certainly not the plaintiff's employer, nor was he "the state, or any political subdivision thereof, [or] any person employing twelve or more persons." Lt. Rudloff employed no one, at least according

---

**11.** W.Va.Code § 5–11–2 (1989) explains the objectives and purposes of the Human Rights Act:

"It is the public policy of the state of West Virginia to provide all of its citizens equal opportunity for employment.... Equal opportunity in the areas of employment and pub-

lic accommodations is hereby declared to be a human right or civil right of all persons...."

The denial of these rights to properly qualified persons by reason of race, religion, color, national origin, ancestry, sex, age, blindness, handicap, or familial status is contrary to the principles of

to this record.[12] By contrast, our choice between the competing interpretations of § 5–11–9(1) is squarely presented regarding the Authority because it is part of "the state" and is, thus, an "employer" within the meaning of the Act.

■ Bearing in mind § 5–11–15's admonition of calling for a liberal interpretation of the Act, we conclude that the plaintiff's interpretation is the preferred one. Several reasons explain our selection. First, it permits us to give the statute's language its literal meaning: § 5–11–9(1) says that an employer shall not discriminate against "an *individual*"; it does not say against "an employee or applicant." Second, we think the plaintiff's interpretation better promotes the purpose of the statute, which is, of course, to guarantee equal opportunity to all persons regardless of their gender, race, religion, etc. Third, no reason exists to insulate an employer from liability if it obstructs the employment opportunities of any individual because of her gender even if she works for, or seeks work with, some other employer.[13]

■ Accordingly, the plaintiff should be given an opportunity on remand to prove that the Jail Authority caused her to suffer a hostile working environment because of her sex and/or caused her to lose her job because of her sex or her opposition to sexual harassment. To prevail on the hostile environment claim, plaintiff will have to show that the Authority's management participated in the harassment or knew about the harassment but failed to take measures reasonably calculated to stop it. *Hanlon, supra*. To prevail

on the discharge claim, the plaintiff must prove the Authority's management caused her termination and did so because of her sex or her opposition efforts. *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995).

■ Next, we address whether the Jail Authority or Lt. Rudloff can be held liable under W. Va.Code § 5–11–9(7). The circuit court held that the Jail Authority was not an entity which could be held liable under that section, and we are assuming that the court used the same reasoning for dismissing Lt. Rudloff from that cause of action. In light of our decision in *Holstein v. Norandex, Inc.*, 194 W.Va. 727, 461 S.E.2d 473 (1995), the circuit court's rulings are clearly wrong. The provision in question makes it an unlawful discriminatory practice:

"For any person ... [or] employer ... to:

(A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section;

.      .      .      .      .

(C) Engage in any form of reprisal or otherwise discriminate against any person because he has opposed any practices or acts forbidden under this article or because he has filed a complaint, testified or

---

freedom and equality of opportunity and is destructive to a free and democratic society.

**12.** We leave for another day whether a corporate officer with full control of a business or a workplace can ever be considered an "employer" within the meaning of §§ 5–11–3(d) or 5–11–9(1).

**13.** Our interpretation also is consistent with both lines of authority that presently exist in the federal courts about the interpretation of § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—3(a). That section makes it unlawful for an employer "to discriminate against any of his employees or applicants for employment" in retaliation for their participation in a Title VII proceeding or investigation or for opposing a practice prohibited by the Act. An issue has aris-

en whether an employer's retaliation against a former employee is actionable under § 704(a). The Fourth Circuit has held that there is no cause of action, relying on the section's literal language and contrasting it with the language of § 703(a), 42 U.S.C. § 2000e—2(a)(1), which makes it unlawful to discriminate against "any individual." *Robinson v. Shell Oil Co.*, 70 F.3d 325 (4th Cir.1995) (*en banc*). Other courts have concluded a claim would lie against a former employer, relying on the purposes of Title VII, generally, and of § 704, in particular. *E.g., Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881 (7th Cir.1996). The Supreme Court has granted certiorari in *Robinson*. —— U.S. ——, 116 S.Ct. 1541, 134 L.Ed.2d 645 (1996). Our reading of § 5–11–9(1) relies on both its literal language and its remedial purposes.

**378**

assisted in any proceeding under this article."

*Holstein* held that this section permitted a cause of action against an employee for aiding or abetting an employer engaging in an unlawful discriminatory practice. An employee is, plainly, a "person" who would be liable if he engages in any of the prohibited acts, W. Va.Code § 5–11–3(a) ("'person' means one or more individuals. . . ."), and Lt. Rudloff is, just as plainly, such a "person." As we have already stated, the Authority is an "employer" under the Act. Thus, both it and Lt. Rudloff can be defendants under § 5–11–9(7).

We also believe that the plaintiff has made sufficient allegations to state claims against both the Authority and Lt. Rudloff under both subsections (A) and (C) of § 5–11–9(7). If Lt. Rudloff urged ARA Szabo to discharge her because of her sex, then he acted "to . . . incite, compel or coerce [ARA Szabo] to engage in an unlawful employment practice" in violation of subsection (A). (The statement attributed to Lt. Rudloff that women employees did not belong at the jail may be enough, by itself, to put that claim at issue.) If Lt. Rudloff's motive in doing so is proved to be retaliatory, then he "engaged[d] in [a] form of reprisal" prohibited by subsection (C). As for retaliation, plaintiff is entitled to offer evidence, if there is any, that Lt. Rudloff knew of her complaints about harassment and that he acted on that knowledge to secure plaintiff's discharge. If Lt. Rudloff acted against the plaintiff in his capacity as an Authority manager, then the Authority may also be liable.[14] Regarding these claims, it will also be relevant whether the Jail Authority dealt as severely with its own employees, or with other individuals working at the jail, who cussed in front of inmates. On this record and at this stage of the litigation, we cannot express any opinion on these issues but merely hold that plaintiff has stated a claim and is entitled to accumulate and put forward her evidence.[15]

### III.

### CONCLUSION

For the reasons stated we affirm the dismissal of the plaintiff's contract claim and the dismissal of Edward Rudloff as a defendant to the sexual discrimination count under W. Va.Code § 5–11–9(1). As to all other rulings of the circuit court, we reverse. Accordingly, the orders of dismissal of the circuit court are vacated, and we remand to the circuit court for further proceedings consistent with this opinion.

Affirmed in part; Reversed and remanded, in part.

RECHT, J., sitting by temporary assignment.

---

**14.** " ' "An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable." Syllabus point 3, *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981).' Syllabus Point 3, *Barath v. Performance Trucking Co., Inc.*, 188 W.Va. 367, 424 S.E.2d 602 (1992)." Syllabus Point 2, *Holstein v. Norandex, Inc.*, 194 W.Va. 727, 461 S.E.2d 473 (1995).

**15.** We find no merit in the plaintiff's contract claim, and for that reason refuse to give it extended discussion.