497 S.E.2d 174

David J. HOSAFLOOK and Kathryn Hosaflook, Plaintiffs Below, Appellants,

v.

The CONSOLIDATION COAL COMPANY, Ronald Stovash and Thomas Simpson, Defendants Below, Appellees.

No. 23045.

Supreme Court of Appeals of West Virginia.

Rehearing Granted Feb. 19, 1997.

Submitted Upon Rehearing March 18, 1997.

Decided June 2, 1997.

Dissenting opinion of Justice Starcher Dec. 17, 1997.

Allan N. Karlin, Morgantown, for Appellants.

Steven P. McGowan, Steptoe & Johnson, Charleston, for Appellees.

Daniel L. Stickler, Erin Elizabeth Magee, Jackson & Kelly, Charleston, for Amicus Curiae West Virginia Coal Association and West Virginia Mining and Reclamation Association.

Evan H. Jenkins, Charleston, for Amicus Curiae West Virginia Chamber of Commerce.

McHUGH, Justice:

The appellants, David J. Hosaflook and Kathryn Hosaflook, appeal the January 12, 1995 order of the Circuit Court of Monongalia County which granted summary judgment for the appellees, Consolidation Coal Company (hereinafter "Consol"); Ronald Stovash, the vice-president of Consol's Fairmont operations; and Thomas Simpson, the superintendent of Consol's Robinson Run Mine, an underground coal mine located in Monongalia County. The circuit court granted summary judgment after concluding that the appellants failed to establish a prima facie case of handicap discrimination under the West Virginia Human Rights Act, set forth in *W. Va.Code*, 5–11–1, *et seq.*, and failed to set forth facts which would constitute the tort of outrage.

As we will explain more fully below, this case is before us on a second rehearing. Upon reconsideration for a second time, we affirm the January 12, 1995 order of the circuit court.

I

*Facts*

David Hosaflook began working for Consol in 1975 as an hourly employee in its Robinson Run Mine and continued in that position until 1990 when Consol offered him a salaried

position of mine foreman which he accepted. Soon after his promotion, Hosaflook and his supervisors noticed that he was experiencing problems at work such as stumbling, bumping into things, and having trouble completing the required paperwork. However, at that time Hosaflook did not know why he was experiencing these problems.

In August of 1991 Consol conducted its annual performance evaluations of all of its salaried employees for merit pay purposes. Hosaflook's evaluation made him one of the lowest ranked salaried employees at the Robinson Run Mine.

In November of 1991 Hosaflook realized that the difficulties he was experiencing (the stumbling, bumping into things, and inability to complete the required paperwork on time) arose from a vision problem which he kept to himself for a period of time. On February 5, 1992, Hosaflook was diagnosed with retinitis pigmentosa (hereinafter "R.P."), a degenerative eye condition that eventually leads to permanent blindness. Hosaflook spoke to his supervisor, Denver Johnson, and a personnel officer, Mark Schiffbauer, and told them he had been diagnosed with R.P. and needed to see a specialist.

In the early part of 1992 Ronald Stovash, Consol's vice-president of Fairmont operations, determined that a reduction in force among salaried employees at the Robinson Run Mine was necessary.[1] It was decided that twenty salaried positions would be eliminated. Thus, in early March of 1992 Consol informed all of its salaried employees of the impending reduction in force at a meeting attended by Hosaflook. Consol explained at this meeting that its intention was to use the lowest scores from the 1991 evaluation performances to select those subject to the reduction in force if enough salaried employees did not voluntarily retire.

On March 25, 1992, Hosaflook delivered to Consol a letter from his optometrist, dated the same day, describing the severity of his eye problem. The letter stated that Hosaflook should not work in an underground mine again due to his eye condition and thus, should be put on long-term disability. Hosaflook states that he and Consol knew at this time that he would never be able to work underground again as a result of his eye condition.

Because Consol's long-term disability plan does not provide benefits until one year after the onset of a total disability, Hosaflook was immediately put on Consol's salary continuance plan which is regulated under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. § 1001, et seq. The salary continuance plan provides incremental continuation of an employee's salary and benefits during periods of short-term illness and disability. The plan expressly states that an employee on the salary continuance plan remains subject to a reduction in force.

On April 1, 1992, Consol terminated Hosaflook's employment as part of the reduction in force. This action resulted in the termination of Hosaflook's benefits under the salary continuance plan.[2] Hosaflook asked Simpson if he could remain on the salary continuance plan because of his eye condition. Additionally, Mrs. Hosaflook called Schiffbauer and requested that Consol leave her husband on the salary continuance plan until the long-term disability program took effect. Both Simpson and Schiffbauer relayed these requests to Stovash who refused to reconsider the decision to include Hosaflook in the reduction in force. Thereafter, Hosaflook filed suit against Consol alleging that his discharge constituted unlawful discrimination against a handicapped person and that the manner of discharge constituted the tort of outrage.

*Procedural History*

The circuit court granted summary judgment for Consol in a January 12, 1995 order after concluding that Hosaflook could not show that he was a "qualified handicapped person" under the West Virginia Human Rights Act. The circuit court came to this

---

1. Consol had already discharged some of its *hourly* employees as a result of a reduction in force.

2. Hosaflook's termination from employment did not affect his eligibility to receive benefits from the long-term disability program.

conclusion after determining that Hosaflook could not perform the essential functions of the job in question (mine foreman) either with or without reasonable accommodation. Additionally, the circuit court held that there were no facts surrounding Hosaflook's discharge which indicated that the discharge was carried out in an outrageous manner. Hosaflook appealed the circuit court's decision to this Court.

In our first opinion, which was filed on July 11, 1996, we affirmed the circuit court's January 12, 1995 order with Justice Cleckley dissenting. Thereafter, this Court granted Hosaflook's petition for rehearing and subsequently withdrew the original opinion and filed an opinion on December 10, 1996, in which we reversed the circuit court's January 12, 1995 order and remanded the case to the circuit court. Consol then petitioned for rehearing, and this Court granted yet another petition for rehearing. On March 18, 1997, we reheard the case. We now withdraw the second opinion. The following opinion will establish the principles in this case.

## II

At the outset, we express our concern over not resolving this case in the prior two opinions. However, as Justice Cleckley stated in his dissent to the first opinion "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259, 264 (1949) (Frankfurter, J., dissenting).

### Standard of Review

■ We are mindful that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We have recognized that courts should be cautious in granting summary judgment in employment discrimination cases. *Conrad v. ARA Szabo*, 198 W.Va. 362, 370, 480 S.E.2d 801, 809 (1996). However, this does not mean that summary judgment is never available in these cases:

Although we refuse to hold that simply because motive is involved that summary judgment is unavailable, the issue of discriminatory animus is generally a question of fact for the trier of fact, especially where a prima facie case exists. The issue does not become a question of law unless only one conclusion could be drawn from the record in the case. In an employment discrimination context, the employer must persuade the court that even if all of the inferences that could reasonably be drawn from the evidentiary materials of the record were viewed in the light most favorable to the employee, no reasonable jury could find for the plaintiff.

*Id.* As we have held in the past,

'[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.' Syl. pt. 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

Syl. pt. 3, *Cannelton Industries, Inc. v. Aetna Casualty & Surety Co. of America*, 194 W.Va. 203, 460 S.E.2d 18 (1994). *See also W. Va. R. Civ. P.* 56.

### The West Virginia Human Rights Act

The first issue is whether Hosaflook may maintain an action of handicap discrimination under the West Virginia Human Rights Act set forth in *W. Va.Code*, 5–11–1, *et seq.* He claims that his handicap is a result of his eye condition and that Consol[3] unlawfully terminated him as part of a reduction in force because of that handicap.

■ The West Virginia Human Rights Act provides that "[i]t shall be an unlawful discriminatory practice ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment *if the individual is able and competent to perform the services required even if such individual is ... handicapped* [.]" *W. Va.Code*, 5–11–9(1) [1992] (emphasis added). When deter-

---

**3.** In this opinion we will refer to the appellees collectively as "Consol."

mining whether an employer has unlawfully discriminated against a handicapped employee, the employee must first establish a prima facie case of handicap discrimination.

In order to establish a case of discriminatory discharge under *W. Va.Code*, 5–11–9 [1989], with regard to employment because of a handicap, the complainant must prove as a prima facie case that (1) he or she meets the definition of 'handicapped,' (2) he or she is a 'qualified handicapped person,' and (3) he or she was discharged from his or her job.[4]

Syl. pt. 2, in relevant part, *Morris Memorial Convalescent Nursing Home, Inc. v. Human Rights Com'n*, 189 W.Va. 314, 431 S.E.2d 353 (1993) (adopting standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)) (footnote added). *See also Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996). At issue is whether Hosaflook has, as a matter of law, proven all of the elements of a prima facie case of handicap discrimination.

■ As required by syllabus point 2 of *Morris Memorial Convalescent Nursing Home, Inc.*, *supra*, Hosaflook must first prove that he is "handicapped." In that all the parties agree that his eye condition is a handicap, Hosaflook is a "handicapped" person within the meaning of the West Virginia Human Rights Act. *Id.* at syl. pt. 2, 431 S.E.2d 353. *See W. Va.Code*, 5–11–3(m)(1) [1992] (defines the term "handicap").[5]

■ The parties disagree, however, on whether Hosaflook has proven the second element articulated in syllabus point 2 of *Morris Memorial Convalescent Nursing Home, Inc.*: whether Hosaflook is a "qualified handicapped person" under the West Virginia Human Rights Act. The term "qualified handicapped person" has been defined by the West Virginia Human Rights Commission (hereinafter the "Commission") as

---

4. There are two theories of employment discrimination: the disparate impact theory and the disparate treatment theory, the latter of which is currently at issue. *Morris Memorial Convalescent Nursing Home, Inc. v. Human Rights Com'n*, 189 W.Va. 314, 317, 431 S.E.2d 353, 356 (1993). Under the disparate treatment theory, West Virginia courts apply the standards enunciated in the United States Supreme Court case of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which standards form the framework of syllabus point 2 of *Morris Memorial Convalescent Nursing Home, Inc.* quoted above.

Subsequently, in *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995) and in *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996), we elaborated on the *McDonnell Douglas* test. Justice Cleckley explained that

to establish a prima facie case of disability discrimination, the plaintiff must show that he is a disabled person within the meaning of the law, that he is qualified to perform the essential function of the job (either with or without reasonable accommodation), and that he has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises.

*Skaggs*, 198 W.Va. at 71 n. 22, 479 S.E.2d at 581 n. 22 (citations omitted).

When a complainant establishes a prima facie case of handicap discrimination

[t]he burden then shifts to the employer to rebut the complainant's prima facie case by presenting a legitimate nondiscriminatory reason for such person's discharge. If the employer meets this burden, the complainant must prove by a preponderance of the evidence that the employer's proffered reason was not a legitimate reason but a pretext for the discharge.

Syl. pt. 2, *Morris Memorial Convalescent Nursing Home, supra*, in relevant part (this portion of syl. pt. 2 is also based on the *McDonnell Douglas* test). We more recently stated:

In disparate treatment discrimination cases under the West Virginia Human Rights Act, W. Va.Code, 5–11–9 (1992), a plaintiff proves a claim for unlawful discrimination if he or she proves by a preponderance of the evidence that a forbidden intent was a motivating factor in an adverse employment action. Liability will then be imposed on a defendant unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

Syl. pt. 6, *Skaggs, supra*. We note, however, that the case now before us concerns *only* whether Hosaflook has established a prima facie case of handicap discrimination.

5. The term "handicap" has been defined as a person who "[h]as a mental or physical impairment which substantially limits one or more of such person's major life activities; the term 'major life activities' includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working[.]" *W. Va.Code*, 5–11–3(m)(1) [1992] (*W. Va.Code*, 5–11–3 was amended in 1994; however, the amendments do not affect the above discussion).

"an individual *who is able and competent,* with reasonable accommodation, to perform the essential functions of the job in question." 77 C.S.R. § 1–4.2 [1991].[6] The phrase "able and competent" means "with or without reasonable accommodation, an individual is currently capable of performing the work and can do the work without posing a serious threat of injury to the health and safety of either the individual, other employees, or the public." 77 C.S.R. § 1–4.3 [1991].[7]

Consol maintains that Hosaflook, by his own admission, cannot presently and will not in the future ever be able to perform the job of mine foreman, either with or without reasonable accommodation. 77 C.S.R. §§ 1–4.2 and 1–4.3 [1991]. Thus, it is Consol's contention that as a matter of law Hosaflook is not a "qualified handicapped person" within the meaning of the West Virginia Human Rights Act.

Though Hosaflook concedes that he will never again be able to work underground as a mine foreman, he essentially maintains that neither the West Virginia Human Rights Act nor its corresponding rules require him to perform the "services required," *W. Va.Code,* 5–11–9(1) [1992], of a mine foreman. Rather, he argues the West Virginia Human Rights Act and its corresponding rules only require that he perform the "services required" to remain on the *salary continuance plan.* Plainly stated, Hosaflook argues that his "job" was that of "benefit recipient" rather than that of "mine foreman."

 We disagree with Hosaflook's interpretation of the West Virginia Human Rights Act.

' " " 'The primary object in construing a statute is to ascertain and give effect to the intent of the legislature.' Syl. Pt. 1, *Smith v. State Workmen's Compensation Comm.,* 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. Pt. 2, *State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984).' Syllabus point 2, *Lee v. West Virginia Teachers Retirement Board,* 186 W.Va. 441, 413 S.E.2d 96 (1991).

Syl. pt. 2, *Francis O. Day Co., Inc. v. Director, Division of Environmental Protection,* 191 W.Va. 134, 443 S.E.2d 602 (1994). " 'Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use.' Syl. Pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 107 S.E.2d 353 (1959)." Syl. pt. 3, *Byrd v. Board of Education of Mercer Co.,* 196 W.Va. 1, 467 S.E.2d 142 (1995). Moreover, an administrative rule authorized by statute is subject to the statutory rules of construction. *See, e.g., Haburalsky v. Recht,* 180 W.Va. 128, 375 S.E.2d 760 (1988).[8]

As previously noted, *W. Va.Code,* 5–11–9(1) [1992] expressly states that it is unlawful for an employer to discriminate against an individual who *"is able and competent to perform the services required"* because of his or her handicap. (emphasis added). The Human Rights Commission has elaborated on the above statutory language in 77 C.S.R. § 1–4.2 [1991] by expressly stating that a "qualified handicapped person" is an individual who *"is able and competent,* with reasonable accommodation, *to perform the essential functions of the job in question."* (emphasis added). "Able and competent" has been defined as *"capable of performing the work and can do the work* [.]" 77 C.S.R. § 1–4.3 [1991]. (emphasis added).

Our resolution of whether Hosaflook is a "qualified handicapped person" under the West Virginia Human Rights Act hinges on the meaning of the following phrases: "perform the services required," *W. Va.Code,* 5–11–9(1) [1992], "perform the essential func-

---

**6.** 77 C.S.R. § 1–4.2 was rewritten in 1994. The major change was to replace the term "handicap" with "disability" in order to conform with the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111–12117. *See* 77 C.S.R. § 1.1 [1994]. In any event, the changes in the definition of "qualified handicapped person" do not affect the discussion above.

**7.** 77 C.S.R. § 1–4.3 was rewritten in 1994; however, the changes do not affect the above discussion.

**8.** The rules regarding discrimination against the handicapped found in 77 C.S.R. § 1–1, *et seq.* were issued under the authority of *W. Va.Code,* 5–11–8(h) [1989] and *W. Va.Code,* 29A–3–1, *et seq.* of the State Administrative Procedures Act.

tions of the job in question," 77 C.S.R. § 1–4.2 [1991], and "capable of performing the work and can do the work," 77 C.S.R. § 1–4.3 [1991]. We conclude that the "ordinary and familiar significance and meaning," *Byrd* at syl. pt. 3, 467 S.E.2d 142, in relevant part, of these phrases do not support Hosaflook's argument that his job is now that of "benefit recipient" rather than "mine foreman." To argue that merely receiving benefits is a "job" or "work" is tenuous at best.[9]

Indeed, as noted by Consol, other courts addressing this issue have come to the same conclusion. For example, in *Equal Employment Opportunity Commission v. CNA Insurance Companies*, 96 F.3d 1039 (7th Cir. 1996), the court addressed whether a plaintiff had a right to bring a claim under the American with Disabilities Act of 1991 (hereinafter the "ADA"), found in 42 U.S.C. § 12101, *et seq.*[10] The plaintiff, who suffered from a mental disability, asserted that her employer unlawfully limited her long-term disability coverage to twenty-four months rather than to unlimited coverage which applies to physical disabilities. The plaintiff was on long-term disability because she could not return to work due to her mental disability.

The Court of Appeals of the Seventh Circuit explained that the employee must show that she was a "qualified individual with a disability" before she could assert her claim under the ADA. That term was defined in the ADA as " 'an individual with a disability who, with or without reasonable accommodation, *can perform the essential functions of the employment position that [the] individual holds or desires.*' " *Id.* at 1043 (*quoting* 42 U.S.C. § 12111(8)). The issue in *CNA Insurance Companies* was whether "a person who is no longer able to hold an 'employment position' fits within" the definition of a "qualified individual with a disability." *Id.* at 1043.

The Equal Employment Opportunity Commission (hereinafter the "EEOC") argued that the plaintiff's "employment position" was that of a "disability benefit recipient." *Id.* at 1043. Thus, "[b]ecause [the insurer] imposes no job-related duties on any of the beneficiaries of its long-term disability plan, [the plaintiff] by definition can perform the essential functions of her position: there are none, other than collecting the benefit checks for as long as she is entitled to do so." *Id.* at 1043–44.

The Court of Appeals rejected the EEOC's argument:

9. Moreover, Hosaflook's argument that his job is that of "benefit recipient" rather than that of "mine foreman" raises the issue of whether his claim would be preempted by ERISA, 29 U.S.C. § 1001, *et seq. See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). More specifically, Hosaflook argues that because his job was that of "benefit recipient" all he had to do to perform the "essential functions of the job in question[,]" 77 C.S.R. § 1–4.2 [1991], was follow the terms of the salary continuance plan. As noted previously, the plan expressly states that an employee on salary continuance remains subject to a reduction in force. Hosaflook asserts that he should not have been included in the reduction in force while receiving benefits from the salary continuance plan for a permanent disability. Thus, notwithstanding that Hosaflook has repeatedly emphasized that he is not arguing that he was unlawfully terminated from the salary continuance plan, it appears that his real complaint in this case is that the terms of the salary continuance plan were unfair or were applied unfairly. Because Consol's salary continuance plan is regulated under ERISA, there is a question of whether ERISA would preempt Hosaflook's claim. However, given that this Court has con-

cluded that Hosaflook has been unable to prove a prima facie case of handicap discrimination under the West Virginia Human Rights Act, we need not delve into this complicated preemption issue. *See* n. 15, *infra*.

10. In the past this Court has acknowledged that cases decided under the Federal Rehabilitation Act of 1973, found in 29 U.S.C. § 701 *et seq.*, have guided it in its decisions under the West Virginia Human Rights Act. *See Morris Memorial Convalescent Nursing Home, Inc., supra.* In that Congress " 'drew upon and incorporated standards developed under the Rehabilitation Act' " when enacting the ADA, *Eckles v. Consolidated Rail Corp.*, 890 F.Supp. 1391, 1403 (S.D.Ind. 1995) (citation omitted), *aff'd*, 94 F.3d 1041 (1996), *cert. denied*, — U.S. —, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997), we find that cases decided under the ADA are also helpful in deciding our cases under the West Virginia Human Rights Act. *See also Maddox v. University of Tennessee*, 62 F.3d 843, 846 n. 2 (6th Cir.1995). We also note that the *McDonnell Douglas* test is applicable to an ADA analysis. *Pasquariello v. Medcentral Health System*, 949 F.Supp. 532, 535 (N.D.Ohio 1996). *See* n. 4, *supra* (discusses the *McDonnell Douglas* test).

We need not tarry long on the argument that the status of 'benefit recipient' fits within the definition of someone filling an 'employment position,' as required by 42 U.S.C. § 12111(8). An 'employment position' is a job. Someone might be applying for a job, in which case § 102 commands that job application procedures and hiring procedures must not be discriminatory. Or that person might be a current employee, in which case § 102 protects her against discrimination in advancement, discharge, compensation, job training, and all other terms, conditions, and privileges of employment. . . . This may or may not be an enlightened way to do things, but it was not discriminatory in the usual sense of the term.

*Id.* at 1044 (citations omitted).[11]

Similarly, in *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768 (8th Cir. 1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988), the court was confronted with whether a totally disabled employee is an "otherwise qualified handicapped person" under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* The plaintiff in *Beauford* filed for disability insurance benefits after informing her employer that she was no longer able to perform her job of teaching school because of her mental and physical problems. The plaintiff asserted that her problems arose out of the pressures of her teaching job. After her employer discontinued her salary and benefits, the plaintiff sued, alleging handicapped discrimination in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[12]

The United States Court of Appeals of the Eighth Circuit concluded that because the plaintiff was no longer able to perform the essential functions of the job in question, she was not a "qualified person" under the Rehabilitation Act:

[S]ection 504 was designed to prohibit discrimination within the ambit of an employment relationship in which the employee is potentially able to do the job in question. Though it may seem undesirable to discriminate against a handicapped employee who is no longer able to do his or her job, this sort of discrimination is simply not within the protection of section 504.

*Id.* at 771.[13] *But see Leonard F. v. Israel Discount Bank of New York*, No. 95 Civ. 6964, slip op. at 6, 1996 WL 634860 (S.D.N.Y. Sept. 24, 1996) (The court found the following opinion of the EEOC to be noteworthy: The plaintiff meets the definition of a "qualified individual with a disability" because "the relevant 'employment position' in any case involving post-employment fringe benefits, is the position actually occupied by the plaintiff, that of benefit recipient[.]").

We find the analyses discussed above in *CNA Insurance Companies* and *Beauford* to be persuasive. Moreover, as previously indicated, the salary continuance plan expressly

**11.** We understand the EEOC's argument; however, we cannot reconcile its argument in *CNA Insurance Companies, supra* and in similar cases with the plain meaning of the West Virginia Human Rights Act and the rules promulgated thereunder. Obviously, language changes to the Act and rules are within the purview of the legislature and the Commission.

**12.** 29 U.S.C. § 794, as quoted in *Beauford*, 831 F.2d at 770 n. 1 states, in relevant part: "No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"

**13.** We note that in *Parker v. Metropolitan Life Insurance Co.*, 99 F.3d 181 (6th Cir.1996) the court was confronted with determining whether a plaintiff, who could no longer work in her job due to her disability and who was receiving long-term disability benefits, was holding an employment position so as to be able to maintain an action under the ADA as a "qualified individual with a disability." The plaintiff argued that her "employment position" was that of a "benefit recipient." Therefore, she asserted that she could maintain an action under the ADA.

The Court of Appeals of the Sixth Circuit disagreed: "Plaintiff's proposed construction of the statute is not persuasive. The concept of 'benefits recipient' as an 'employment position' relies on a convoluted construction of statutory language, which conflicts with the plain meaning of the words." *Id.* at 187.

However, on February 6, 1997 the United States Court of Appeals of the Sixth Circuit voted for rehearing of this case in banc. *Parker v. Metropolitan Life Insurance Co.*, 107 F.3d 359 (6th Cir.1997). Thus, the *Parker* case reported in 99 F.3d 181 was vacated. Reargument is scheduled for June 11, 1997.

states that "[a]n employee receiving benefits under the Plan is subject to termination or a reduction in the work force as if this Plan were not in operation." The legislature has expressly stated "[t]hat it shall not be unlawful discriminatory practice for an employer to observe the provisions of any bona fide ... employee insurance or welfare benefit plan or system[.]" *W. Va.Code,* 5–11–9(1) [1992]. Thus, *W. Va.Code,* 5–11–9(1) [1992], allows Consol to observe the express terms of its salary continuance plan and include in its reduction in force an individual, such as Hosaflook, who was on the plan.

This Court is not unsympathetic to Hosaflook's plight. However, the West Virginia Human Rights Act does not protect an individual who, due to a handicap, is unable to perform the essential functions of a job either with or without accommodation.[14] *See* 77 C.S.R. § 1–4.2 [1991]. We conclude, therefore, that Hosaflook is not a "qualified handicapped person" as that term is defined under the West Virginia Human Rights Act.[15]

■ Accordingly, we hold that in order to establish a prima facie case of handicap discrimination pursuant to *W. Va.Code,* 5–11–9 [1992] of the West Virginia Human Rights Act, which provides that it is unlawful "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if

---

**14.** In his petition for appeal Hosaflook expressly states that he does "not contend that he should be allowed to continue to work as a coal miner or to be transferred to some other position.... Unlike most cases, Hosaflook was not contending that he could continue to be a [mine foreman] with a reasonable accommodation. Rather, he contended that he should not be terminated from disability." Based on this statement, Hosaflook abandoned his argument that he wanted to be transferred to a job above ground as a reasonable accommodation for his disability.

If, however, Hosaflook had not abandoned his reasonable accommodation request, we note that in *Coffman v. West Virginia Board of Regents,* 182 W.Va. 73, 386 S.E.2d 1 (1988), we held that "[w]here a handicapped employee can no longer perform the essential functions of that position, reasonable accommodation does not require an employer to reassign him to another position in order to provide him with work which he can perform." *Id.* at syl. pt. 2, 386 S.E.2d 1, in relevant part. In *Skaggs, supra,* we overruled the above statement in *Coffman* in syllabus point 4 which states, in relevant part:

If the employee cannot be accommodated in his or her current position, however it is restructured, then the employer must inform the employee of potential job opportunities within the company and, if requested, consider transferring the employee to fill the open position. To the extent that *Coffman v. West Virginia Board of Regents,* 182 W.Va. 73, 386 S.E.2d 1 (1988), is inconsistent with the foregoing, it is expressly overruled.

However, we made clear that the above holding was not to be applied retroactively:

As the defendant rightly points out, however, the requirements we put in force today were not part of the West Virginia law at the time these employment decisions were made. In addition to *Coffman's* holding that there was no duty to consider and make available positions other than the one the plaintiff had at the time of his discharge, the Commission's rules that were in effect in May 1991 (and that remained in effect until May, 1994) specifically excluded transfer to an open position as a possible accommodation that could be required by the Human Rights Act. Under the circumstances, we are compelled to agree with the defendant that reversal based on a revised interpretation of the reasonable accommodation duty would be inappropriate. To apply our new ruling retroactively in this case would be unfair and would punish the defendant for what may have been an attempt to comply with the law as it existed at the time of the plaintiff's discharge. Therefore, we hold that the ruling in this case will apply prospectively only. *Id.* at 70, 479 S.E.2d at 580.

Likewise, when Consol made the decision to include Hosaflook in a reduction in force in 1992, the law "specifically excluded transfer to an open position as a possible accommodation that could be required by the Human Rights Act." Thus, Consol was not required to transfer Hosaflook to another position as a possible accommodation.

**15.** Consol notes that most persons on the salary continuance plan can perform their jobs either with or without reasonable accommodation. Consol further notes that when employees are put on the salary continuance plan, whether they have the flu, a broken arm, or R.P., they retain their title and are treated as an employee at the mine to which they are assigned. Lastly, Consol states that an employer does not have to provide a salary continuance plan to its employees. Although Consol recognizes that if it does provide such a plan it may not be provided in a discriminatory manner, Consol maintains that any actions brought alleging discriminatory conduct by Consol under the salary continuance plan would be preempted by ERISA, 29 U.S.C. § 1001 *et seq.* *See* n. 9, *supra.*

such individual is ... handicapped[,]" a claimant must prove, *inter alia*, that he or she is a "qualified handicapped person" as that term is defined in 77 C.S.R. § 1–4.2 [1991]. 77 C.S.R. § 1–4.2 [1991] defines "qualified handicapped person" as "an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job in question." Furthermore, 77 C.S.R. § 1–4.3 [1991] defines "able and competent" as "capable of performing the work and can do the work[.]" An individual who can no longer perform the essential functions of a job either with or without reasonable accommodation and, thus, who is receiving benefits under a salary continuance plan which does not provide otherwise, is not performing the essential functions of a job by being a benefit recipient. Therefore, that person is not a "qualified handicapped person" within the meaning of the West Virginia Human Rights Act. Because Hosaflook could not prove a prima facie case of discriminatory discharge under *W. Va. Code,* 5–11–9 [1992], the circuit court's entry of summary judgment for Consol on this issue was appropriate.

### The tort of outrage claim

■ The second issue is whether Hosaflook has stated facts sufficient to present his tort of outrage or intentional infliction of emotional distress claim to a jury. In his brief, he outlines the following facts which he maintains are sufficient to prevent summary judgment from being entered against him on this issue:

Consol knew Hosaflook, a sixteen-year employee, was going blind when it included him in the [reduction in force (hereinafter "RIF")]. Simpson then proceeded to tell Hosaflook that his RIF was the result of his job performance without any attempt to determine whether there was a relationship between his alleged poor performance and his progressive vision loss. When it broke the news to Hosaflook, cutting him off disability benefits, it did not even tell him what if any benefit rights he might

have.... Thus, Consol's approach to Hosaflook left him facing blindness with the clear idea that he had lost his ability to support his family because he had failed as a foremen. Hosaflook contends that, in a civilized society, employers do not treat any employees, let alone long term employees, in such a recklessly insensitive fashion.

Conversely, Consol maintains that Hosaflook's tort of outrage claim is duplicative of the wrongful discharge claim. More specifically, Consol asserts Hosaflook is essentially complaining that his emotional distress arises from his financial loss due to the termination of his benefits under the salary continuance plan. Furthermore, Consol asserts that Hosaflook has not identified any act by Consol, other than the fact that he was terminated as part of the reduction in force, which might provide a basis for his tort of outrage claim. We agree with Consol.

■ This Court has recognized that damages may be recovered for the tort of outrageous conduct or the intentional infliction of emotional distress: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Syl. pt. 6, *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982). *See also* syl. pt. 3, *Tanner v. Rite Aid of West Virginia, Inc.,* 194 W.Va. 643, 461 S.E.2d 149 (1995); syl. pt. 1, *Dzinglski v. Weirton Steel Corp.,* 191 W.Va. 278, 445 S.E.2d 219 (1994).[16] We have made clear that "the tort of intentional infliction of emotional distress, which is based on 'outrageous conduct,' requires a strong showing of behavior that goes 'beyond all possible bounds of decency[.]'" *Hines v. Hills Dept. Stores, Inc.,* 193 W.Va. 91, 98, 454 S.E.2d 385, 392 (1994) (Cleckley, J., concurring) (*quoting Restatement (Second) of Torts* § 46 at 71–73 (1965)).

The following four factors generally must be proven by a plaintiff alleging the tort of

16. Our formulation of this cause of action was patterned after Section 46 of the *Restatement (Second) of Torts* (1965). *See Tanner,* 194 W.Va. at 650, 461 S.E.2d at 156; *Dzinglski,* 191 W.Va. at 283, 445 S.E.2d at 224.

outrage: " 'One, the wrongdoer's conduct was intentional or reckless.... Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality.... Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.' " *Harless,* 169 W.Va. at 694–95, 289 S.E.2d at 704 (*quoting Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (1974)). *See also Hines,* 193 W.Va. at 98, 454 S.E.2d at 392 (Cleckley, J., concurring) (Justice Cleckley elaborated on the above four factors); *Tanner,* 194 W.Va. at 650 n. 10, 461 S.E.2d at 156 n. 10.

In prior cases, we have made clear that an employment discrimination claim can lead to two separate actions: one for wrongful discharge and one for intentional infliction of emotional distress (or tort of outrage). *See Dzinglski, supra.* The first action involves the employment discrimination itself. *Id.* at 284, 445 S.E.2d at 225 (*citing Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977)). The second action involves the "outrageous manner in which the discrimination ..., the discharge, was implemented[.]" *Id.* at 285, 445 S.E.2d at 226 (*citing Farmer, supra*).

 Consol maintains that Hosaflook has alleged a wrongful discrimination claim rather than a tort of outrage claim. This Court has held that the two claims are to be distinguished:

> The prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: *when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach.* When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on the va-

lidity of the employer's motivation or reason for the discharge. Therefore, any other conduct that surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.

Syl. pt. 2, *Dzinglski, supra.* (emphasis added).

Hosaflook argues that it was outrageous for Consol to include a sixteen-year employee who was going blind and on the salary continuance plan in a reduction in force. Hosaflook has not identified any facts which suggest that Consol's conduct when effecting his discharge was outrageous. As the circuit court noted in its January 12, 1995 order "[Hosaflook] testified that he was called into an office, was told that he was being discharged, was advised of benefits available to him and nothing more. He was not singled out, embarrassed, threatened, verbally abused, ridiculed or humiliated." Clearly, Hosaflook is claiming that his distress is the result of a wrongful discharge "rather than from any improper conduct on the part of the employer in effecting the discharge[.]" *Id.,* in relevant part. Thus, we conclude that Hosaflook is essentially asserting a wrongful discharge claim rather than a tort of outrage claim.

As previously stated

> '[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.' Syl. pt. 4, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

Syl. pt. 3, *Cannelton Industries, Inc., supra.* In that Hosaflook has not identified any facts which suggest that Consol's conduct when effecting the discharge was outrageous, this Court concludes that he has failed as a matter of law to make a sufficient showing on the essential elements of the tort of outrage claim. Accordingly, we conclude that the circuit court properly granted summary

judgment for Consol on this issue.[17]

## III

Whether or not it is undesirable for a company to discharge, as part of a reduction in force, an employee who is permanently disabled and who is on a salary continuance plan is not policy for this Court to set. The West Virginia Human Rights Act simply does not protect such an employee if he or she is unable to perform the essential functions of a job either with or without reasonable accommodation. More specifically, we conclude that the legislature did not intend for an individual, who can no longer perform the essential functions of a mine foreman either with or without reasonable accommodation, and thus, who is receiving benefits under a salary continuance plan, as a "qualified handicapped person" under the West Virginia Human Rights Act.

Moreover, although it may seem unkind for an employer to terminate an individual with a handicap who cannot perform the essential functions of a job either with or without reasonable accommodation as part of a reduction in force, this action, in and of itself, does not as a matter of law support a claim for the tort of outrage. Accordingly, based on all of the above, we affirm the January 12, 1995 order of the Circuit Court of Monongalia County.

Affirmed.

STARCHER, Justice, dissenting:

(Filed Dec. 17, 1997.)

"We are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen*, 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 397, 533 (1953) (Jackson, J. concurring).

I suspect that few of our cases illustrate this principle better than the instant case. After two rehearings, two previous majority opinions and one previous dissenting opinion, the current majority opinion is very likely the "final" word for Mr. Hosaflook. Mr. Hosaflook is now barred from bringing a lawsuit under our statute prohibiting employment discrimination against persons with disabilities.

Why is he so barred? Ironically, because he is disabled, and can "no longer perform the functions of the job in question."

It is open to serious question, however, whether the current majority opinion, even if it is the final word in the instant case, will be the last or otherwise "infallible" word on the important issues which are presented by the facts of Mr. Hosaflook's case.

For one thing, the majority opinion at footnote 11 quite properly invites the revision of the applicable statutes and/or regulations, to prevent further "unkind" actions of the sort suffered by Mr. Hosaflook. While I do not find such revision necessary, I also would welcome all necessary steps to prevent all forms of handicap discrimination in the employment area, including in the provision of disability benefits.

Another reason that the current majority opinion will not put these issues to rest is that other cases—before this Court and before other courts who may well examine our opinions in this case—will continue to address these thorny problems of employment discrimination law. In fact, there is an ongoing national judicial debate on the issue of whether a disabled person can be a "qualified individual with a disability." I hope that this dissent will provide some weight on the side

---

17. Hosaflook argues that because his handicap affected his performance evaluation in 1991, Consol should not have used the 1991 scores when determining whether he would be included in the reduction in force. Hosaflook apparently argues that his performance as mine foreman should be reevaluated and his scores modified to take into account his handicap. Hosaflook points to no legal authority to support this argument.

On the other hand, Consol argues that an employer owes a handicapped employee a reasonable accommodation if one is available, but does not owe an employee "bonus points" on a performance evaluation.

As Hosaflook concedes, no reasonable accommodation is available in this case, as he is unable to perform the essential functions of a mine foreman either with or without reasonable accommodation. *See* n. 14, *supra*. Thus, because no reasonable accommodation would enable Hosaflook to perform the essential functions of his job as mine foreman, a reevaluation of his performance would be futile. Accordingly, we find Hosaflook's argument to be without merit.

of liberally construing the law in favor of protecting *all* people from disability discrimination.

I do not disrespect the well-articulated reasoning of the current majority opinion. But ultimately I prefer the result and the (also well-articulated) reasoning of the prior unanimous majority opinion, authored by Justice Joseph Albright, which was issued after this Court's first rehearing. I also agree with the (also well-articulated) reasoning of the dissent to this Court's original opinion, authored by Justice Franklin Cleckley—and with those judicial voices in the ongoing national debate which favor a liberal construction of the law.

Rather than reiterate the discussion and reasoning set out in the previous dissent and opinions in the instant case, I append them to this note of my dissent. For the record, then, our course in this case—and the varying approaches we have taken during that journey—are presented for the reader *in toto.*

## APPENDIX ONE

This Court's Initial Opinion—July 11, 1996—Denying Plaintiff Relief

ALBRIGHT, J.:

Appellants, David Hosaflook and Kathryn Hosaflook, appeal an order granting summary judgment to appellees, Consolidated Coal Co. (Consol), Ronald Stovash, Vice-President of Consolidation Coal Co.'s Fairmont Operations, and Thomas Simpson, Superintendent of the Robinson Run Mine.[1] Summary judgment was granted to Consol on January 12, 1995, by the Circuit Court of Monongalia County, West Virginia. Appellants claim the lower court erred in holding that Mr. Hosaflook was not a "qualified handicapped person" within the meaning of the West Virginia Human Rights Act, W.Va. Code § 5–11–1 *et seq.,* and in holding that the facts of this case do not support a claim for the tort of outrage.

Appellant, David Hosaflook, began working for Consol in 1975 as an hourly employee at the Robinson Run Mine, which is an underground coal mine in Monongalia County, West Virginia. Mr. Hosaflook left the hourly work force in 1990 to accept the salaried position of section foreman. As a foreman, he was assigned to underground work at Robinson Run Mine. Mr. Hosaflook acknowledges that from the beginning he had difficulty performing the tasks required of supervisors. He asserts that the difficulties he encountered, which can be summarized as stumbling and bumping into things and problems with paperwork required by the job, resulted from a handicap, the gradual deterioration of his vision.

In August of 1991, Consol followed its annual practice of conducting performance evaluations of all salaried employees in the Northern West Virginia Region. Performance evaluations assessed a salaried employee's performance during the preceding year, in this instance, August 1, 1990, through July 31, 1991. Evaluations were used for merit pay raise purposes. Although a reduction in force at the mine central to this case occurred later, appellees assert that, at the time of the performance evaluations, a reduction in force was not being planned, and Mr. Hosaflook was not then considered a handicapped person.

When the 1991 performance evaluations were completed Mr. Hosaflook was one of the lowest ranked salaried employees at the Robinson Run Mine, due in large measure to the difficulties he had been encountering as a result of what was later identified as the deterioration in his vision. His total score on the evaluation was 99 out of a possible 160.

In November, 1991, Mr. Hosaflook began to recognize that the difficulties he was experiencing arose from his vision problem. For a time, he kept the problem to himself. However, on February 5, 1992, he was diagnosed with retinitis pigmentosa (R.P.), which is a degenerative eye condition that eventually culminates in total and permanent blindness. Mr. Hosaflook claims he spoke to a

---

**1.** In this opinion, we refer to the appellees collectively as Consol.

supervisor, Denver Johnson, and a personnel officer, Mark Schiffbauer, and told them he had been diagnosed with R.P. and needed the name of a specialist to see regarding the diagnosis. Apparently he did not discuss the details and severity of the disease at that time. Consol contends that these inquiries regarding a specialist did not result in the company being aware of Mr. Hosaflook's disability at that time.

Appellees contend that a determination that a reduction in force among salaried employees at the mine was necessary was first made in early 1992 by Ronald Stovash, Consol's Vice–President of Fairmont Operations.[2] Eventually, it was determined that a total of twenty salaried positions would be eliminated at Robinson Run Mine. In early March, 1992, all salaried personnel at the mine were notified of the impending reduction at a meeting that Mr. Hosaflook attended. Prior to that meeting, Consol had ranked the salaried work force based on the 1991 performance evaluation scores, and the salaried employees were told at the meeting of Consol's intention to use the scores to select those to be discharged. Mr. Hosaflook's position as one of the lowest ranked foremen made his layoff a virtual certainty. At the meeting, it was explained that twenty individuals would be involuntarily laid off from the Robinson Run Mine unless there were enough volunteers for early retirement. Mr. Hosaflook concedes that the selection of persons to be included in the reduction in force was based on the evaluation scores, with possibly one exception.

On March 25, 1992, Mr. Hosaflook delivered to Consol a letter from his eye doctor, dated that same day, describing the severity of his vision problem. The letter stated Mr. Hosaflook could never work underground again and should be placed on long-term disability. The letter advised that the progression of the disease would lead to eventual blindness. Mr. Hosaflook was placed on Consol's Salary Continuance Program, a benefit program federally regulated under the Employee Retirement Income Security Act of 1975, 29 U.S.C. §§ 1001, *et seq.* (ERISA). The salary continuance program provided for incremental continuation of an employee's salary and benefits during periods of short-term illness and disability, in part as a bridge between the onset of disability and qualification for long-term disability benefits provided by Consol as an employment benefit. The salary continuance program, as adopted by Consol, expressly states that an employee on salary continuance remains subject to a reduction in force. Consol also treats employees on the salary continuance program as remaining on the work force for the site to which they were last assigned prior to the disability or illness giving rise to the use of the salary continuance program.

On April 1, 1992, the reduction in force was made. Under Consol's policies, the employment relationship between a salaried employee and the employer is terminated when a reduction in force is effected, and, pursuant to the express terms of the salary continuance program, separation by reason of a reduction in force also removes the employee from the salary continuance program. Incident to this reduction in force, Mr. Schiffbauer and Mr. Simpson met with Mr. Hosaflook to explain that he had been terminated, as a result of the reduction in force, due to job performance. Mr. Hosaflook and his wife, Kathryn Hosaflook, requested that he remain on the salary continuance program despite his termination. This message was relayed to Ronald Stovash, who had made the final determination to include Mr. Hosaflook in the force reduction. The request was denied.

The Hosaflooks, appellants here, filed this action in the Circuit Court of Monongalia County, alleging that Mr. Hosaflook's discharge constituted unlawful discrimination against a handicapped person and that the manner of discharge constituted the tort of outrage, from which Mr. Hosaflook suffers severe emotional distress.

Consol filed a motion for summary judgment, which the circuit court granted. The

---

**2.** A reduction of hourly employees occurred in August, 1991. At that time, a reduction of salaried employees was not being considered.

court's January 12, 1995 order states, "[p]laintiff filed this action alleging that he was wrongfully terminated in violation of the West Virginia Human Rights Act in that he contends that at the time of his discharge he was an otherwise qualified handicapped person. Additionally, the plaintiff contends that the facts surrounding his discharge were so outrageous that those facts constituted the tort of outrage." The court found that "[c]learly the doctor's diagnosis and prognosis demonstrate that the plaintiff could no longer safely perform the job for which he was hired after the onset of retinitis pigmentosa. Accordingly, under no circumstances could the plaintiff be considered a 'qualified handicapped person' at the time of his layoff on April 1, 1992." After discussing the difference between a claim for wrongful discharge and a claim for outrageous conduct, the court stated:

> In this case no construction of the facts surrounding the implementation of the discharge support a contention that the discharge was implemented in an outrageous manner. The plaintiff testified that he was called into an office, was told that he was being discharged, was advised of benefits available to him and nothing more. He was not singled out, embarrassed, threatened, verbally abused, ridiculed or humiliated.

Appellants appeal that judgment to this Court.

## STANDARD OF REVIEW

█ The controlling issue on appeal is whether the trial court appropriately granted summary judgment to Consol. This Court has stated that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189,

451 S.E.2d 755 (1994). Under Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment should be granted when the moving party shows there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law.

## SUBSTANTIVE ISSUES

In the appeal, appellants first contend that the lower court erred in holding that Mr. Hosaflook was not a "qualified handicapped person" within the meaning of the West Virginia Human Rights Act, W.Va.Code § 5–11–1 *et seq.*[3] Appellant concedes that under W.Va.Code § 5–11–9(1) individuals are protected from discrimination only if they meet two requirements: (1) the person must be handicapped within the meaning of the act, and (2) if the individual meets the definition of "handicap," the employer must not discriminate against him if he is "able and competent to perform the services required" by his employment.

Appellant then argues that the lower court erred in finding he could not perform the services required. He claims that he is not required to perform the services of a coal mine foreman, but rather only the services required to remain on the salary continuance program. Appellant does not contend he should be allowed to continue employment as an active coal miner.

Appellee argues that the services required of Mr. Hosaflook were those attendant upon the position of mine foreman, not the passive function of being eligible for salary continuance, and that Mr. Hosaflook could not perform the essential functions of his job, that being mine foreman. Therefore, appellees contend, Mr. Hosaflook was not a qualified handicapped person. The circuit court found that appellant's job was that of a section foreman in an underground coal mine and

---

**3.** West Virginia Code § 5–11–9(1) (1992) states:
 It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:
 (1) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employ-

ment if the individual is able and competent to perform the services required even if such individual is blind or handicapped: Provided, That it shall not be unlawful discriminatory practice for an employer to observe the provisions of any bona fide pension, retirement, group or employee insurance or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this subdivision[.]

held that "under no circumstances could the plaintiff be considered a 'qualified handicapped person' at the time of his layoff on April 1, 1992." We agree and affirm the ruling of the trial court.

This Court has declared the necessary elements one must meet in order to establish a *prima facie* case of handicap discrimination pursuant to W.Va.Code § 5–11–9(1):

> In order to establish a case of discriminatory discharge under *W. Va.Code*, 5–11–9 [1989], with regard to employment because of a handicap, the complainant must prove as a prima facie case that (1) he or she meets the definition of "handicapped," (2) he or she is a "qualified handicapped person," and (3) he or she was discharged from his or her job.

*Morris Nursing Home v. Human Rights Commission,* 189 W.Va. 314, 318, 431 S.E.2d 353, 357 (1993).

In the case at bar, only the second element of this test is at issue. In applying the provisions of W.Va.Code § 5–11–9, a "Qualified Individual with a Disability" has been defined by regulation as "an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job[.]" 6B WV CSR § 77–1–4.2; W.Va.Code § 5–11–9 (1992). In considering this definition and whether Mr. Hosaflook is "able and competent to perform the services required," we find it necessary to determine whether salary continuance is a "job," or whether, as appellees contend, the services required for the purposes of applying the Human Rights Act to this case are the services of a mine foreman.

*Black's Law Dictionary* 835 (6th ed.1990) defines "job" as "[a] specific task or piece of work to be done for a set fee or compensation[;][e]mployment position[.]" The United States Supreme Court set forth three essential elements of "work" in *Jewell Ridge Coal Corp. v. Local No. 6167, etc.,* 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945):(1) physical or mental exertion; (2) the exertion is controlled or required by the employer; and (3) the exertion pursued is necessarily and primarily for the benefit of the employer and

his business (quoting *Tennessee Coal Co. v. Muscoda Local,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944)).

We note that participation in the salary continuance program simply does not involve work and that, there being no work to be performed, there are no services required. Said another way, there is no evidence here that Mr. Hosaflook provided any services or did any work to remain on the salary continuance program. No physical or mental exertion was required to obtain the salary continuance. There is no evidence that what Mr. Hosaflook did with his time while receiving salary continuance was controlled or required by the employer. There being no evidence of mental or physical exertion as a condition of receiving salary continuance, there is no evidence that Mr. Hosaflook's activities while receiving salary continuance were pursued for the necessary and primary benefit of his employer. The basic premise of salary continuance is that one is not able to work, and not able to provide the services required by a job from which one is excused, while still receiving all or part of his or her salary. Salary continuance does not fit the definition or fulfill the requirements of a "job" or "work."

We agree with the circuit court's conclusion that, at the time of his discharge, appellant's job was that of a section foreman. That position requires services to be performed, services involving physical or mental exertion, controlled by the employer and pursued to its benefit. By reason of Mr. Hosaflook's disability, it appears he was neither able nor competent to perform those services at the time of his discharge. We note that appellants do not argue before us that Mr. Hosaflook might have been able to continue his work as a mine foreman had appellees provided a "reasonable accommodation" to enable him to perform the essential functions of that job. Rather, we have before us only the claim that participation in the salary continuance program is itself a job requiring services that Mr. Hosaflook was able and competent to perform. For the reasons just discussed, we cannot agree. Accordingly, we hold that a salary continuance plan is not a "job" within the meaning of the regulation,

6B WV CSR 77–1–4.2, and therefore the receipt of benefits under such a plan does not constitute the performance of services under section 9 of the West Virginia Human Rights Act, W.Va.Code § 5–11–1 *et seq.* (1992).

As an additional argument, appellee states that the company did not know of appellant's handicap until after the decision was made to lay him off, and that, as a matter of law, the decision could not have been motivated by a discriminatory intent. While there is a dispute as to the effect of Mr. Hosaflook's first inquiry regarding the need for an eye specialist to diagnose and treat the disabling condition, there is no dispute that Consol was not provided with a physician's diagnosis of appellant's condition until March 25, 1992, three weeks after the March 1, 1992 meeting announcing performance-based layoffs. The layoffs were based on performance evaluations conducted months before anyone, including appellant, realized the extent of appellant's disability. We agree with appellee that these circumstances do not disclose any basis for the employee's termination other than a perceived poor performance record.

Appellant next argues that he stated facts sufficient to present his claim of intentional infliction of emotional distress to a jury. Appellant contends his termination was outrageous because appellee included him, a sixteen-year employee with R.P., in a reduction in force as a result of job performance, without attempting to ascertain whether there was a relationship between his poor job performance and his eye condition.

Appellee argues that the claim of outrageous conduct flows from the economic impact of the discharge and is, therefore, duplicative of the wrongful discharge claim. Appellee asserts that with regard to the claim of outrageous conduct, the circuit court properly held that appellee was entitled to summary judgment as a matter of law. We agree and affirm the ruling of the court.

A claim for wrongful discharge and a claim for the tort of outrage may both exist in an employment-related case. However, the claims differ and are indeed separate claims.

This Court distinguished between the two claims in syllabus point 2 of *Dzinglski v. Weirton Steel Corp.,* 191 W.Va. 278, 445 S.E.2d 219 (1994), which states:

> The prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach. When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on the validity of the employer's motivation or reason for the discharge. Therefore, any other conduct that surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.

The tort of outrage was first defined by this Court in syllabus point 6 of *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982), which states:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Justice Cleckley enlarged on the definition of outrage and summarized the four elements of the tort in his concurrence in *Hines v. Hills Department Stores, Inc.,* 193 W.Va. 91, 98, 454 S.E.2d 385, 392 (1994) (per curiam), as follows:

> The four elements of the tort can be summarized as: (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would

result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

When we consider the facts that surround the termination of employment in this case, we find the tort of outrage is not established as a matter of fact or law. Appellant was discharged due to a reduction in force, based on a performance evaluation that was conducted prior to anyone realizing he had a handicapping condition. All salaried employees were informed of an impending reduction in the salaried work force and were told the reduction would take place based on the performance evaluations. The force reduction rankings were completed at that time. Consol, at best, had only very limited information regarding the severity of appellant's vision problem and its sad prognosis.

When appellant was discharged, he was called into an office and was told he was being discharged and was advised of the benefits available to him. We find that appellant has presented no evidence that the company's behavior surrounding the discharge was so "atrocious" as to be "utterly intolerable in a civilized community" or "so extreme and outrageous as to exceed all possible bounds of decency." This Court believes that the trial court did not err in ruling, "There is simply no construction of these facts that would constitute the tort of outrage. Accordingly, the plaintiffs claim of outrageous conduct must [ ] fail."

Appellee argues that appellant's claims, including the claim that he was improperly terminated from salary continuance, are preempted by the Employee Retirement Income Security Act of 1975, 29 U.S.C. §§ 1001, *et seq.* (ERISA). In light our holding herein, we find it is not necessary to reach the preemption issue.

For the reasons set forth above, the order of the Circuit Court of Monongalia County is affirmed.

Affirmed.

August 6, 1996—Dissent to Original Opinion

CLECKLEY, J., dissenting:

I initially indicated my separate opinion would be a concurrence. After a closer look at the record and the facts developed below, however, I find it necessary to dissent. Justice Potter Stewart once remarked that "[i]n these circumstances the temptation is strong to embark upon a lengthy apologia." *Boy's Markets Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). These remarks somewhat underscore the stress I feel when I must confess at this time that initially I was in error ever to agree with the result reached by the circuit court. However, like Justice Stewart, I will take refuge in an aphorism of Justice Felix Frankfurter: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters National Bank & Trust Co.,* 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting). This case presents an excellent opportunity for this Court to close a loophole in our Human Rights Act (Act) with respect to all forms of employment discrimination, and especially to those purveyed against persons with disabilities. Unfortunately, the reasoning used and the result reached by the circuit court opened the hole, and the majority has refused to close it. Thus, I respectfully dissent.

In presenting this appeal, Mr. Hosaflook argued that his termination violated the Act's ban on employment discrimination against persons with disabilities and that the termination constituted the tort of outrage. Although I will address each issue to some extent, I will primarily confine my dissent to the discrimination issue raised by the appellant.

The circuit court ruled that Mr. Hosaflook failed to carry his burden of establishing a prima facie showing of unlawful handicap discrimination and that summary judgment on this claim was therefore appropriate. In affirming the circuit court's ruling on this claim, the majority has concluded that Mr. Hosaflook failed to satisfy the second element of a prima facie case of handicap dis-

crimination, i.e., establishing that he is a qualified handicapped person.[4]

In my opinion, Mr. Hosaflook did put forth a prima facie case. West Virginia Code, 5–11–9(1) (1992), of the Human Rights Act makes it an "unlawful discriminatory practice" for an employer "to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or handicapped[.]" The Salary Continuance Program (SCP), in which Mr. Hosaflook was a participant at the time of his termination, was clearly part of the Consol package constituting the "compensation, hire, tenure, terms, conditions or privileges of employment." If, as the plaintiff alleged, Consol decided to terminate his SCP benefits because of his handicap, then it discriminated against him with regards to the terms, conditions or privileges of his employment.

The majority, however, seizes on the language in Code, 5–11–9(1), that limits unlawful discrimination to cases in which the individual is "able and competent to perform the services required," and on the derivative requirement in the regulations and our case law that a plaintiff claiming handicap discrimination must show the he or she can perform the essential functions of the job. The majority looked to Black's Law Dictionary for the definition of "job" and to a pair of decisions under the Fair Labor Standards Act, *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945), and *Tennessee Coal. Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944), to define "work." Using those authorities, the majori-

ty concluded that "job" means physical or mental exertion, controlled by the employer, for compensation. Continuing its exercise in logic, the majority then deducts that Hosaflook must lose because he could not perform the job of an underground foreman, and because the SCP did not require him to exert any effort or submit to the company's control, and was therefore not a job.

Unfortunately, the majority failed to follow that reasoning to its logical conclusion. If the Court had, it would realize that it has essentially written disability protection plans, such as the SCP, out of the Human Rights Act. For in order to qualify for SCP, an employee must be disabled from performing his regular assignments. Thus, if "job" and "services required" are limited to the majority's narrow reading, then an employer could, without Human Rights Act liability, decide to eliminate (for example) all black foremen from its SCP rolls because, by definition, those employees on SCP are unable to perform the services of a foreman. Such a case is no different from what Mr. Hosaflook has alleged, *i.e*, that he was selected for elimination because of his membership in a protected class—the class of handicapped persons. I find that result—allowing discrimination against persons with disabilities in the administration of a program to insure against the effects of a disability on the rationale that the persons are not entitled to statutory protection because they are disabled from working—to be not only bizarre, but also antithetical to the purposes of the Human Rights Act explicitly set forth by the Legislature in W. Va.Code 5–11–2 (1989). If the Act is read as the majority says it should be, it would afford no relief to an individual receiving temporary[5] disability benefits when his

---

**4.** In Syllabus Point 2, *Morris Nursing Home v. Human Rights Commission*, 189 W.Va. 314, 431 S.E.2d 353 (1993), we indicated, in relevant part, that:

"In order to establish a case of discriminatory discharge under W. Va.Code, 5–11–9 [1989], with regard to employment because of a handicap, the complainant must prove as a prima facie case that (1) he or she meets the definition of 'handicapped,' (2) he or she is a 'qualified handicapped person,' and (3) he or she was discharged from his or her job . . . ."

The majority has assumed, without analysis, that Mr. Hosaflook is "handicapped" within the meaning of the Act. I will not take up this assumption.

**5.** The case of an individual who is receiving benefits under a permanent disability or retirement plan might present a different analysis because in that case the employment relationship may have terminated. We need not, at this time, consider the implications of such circumstances because here Mr. Hosaflook clearly was a Consol employee at the time of the adverse decision was made. *See* n. 2, *infra.*

employer says to him, "We are terminating your employment and your benefits because you have a disability."

To avoid such an anomalous and unseemly result, the Act must be applied with greater sensitivity to the context in which its terms are used and with greater deference to the legislative purposes. Although authorities such as dictionaries and the case construing other statutes [6] can provide relevant insights, blind reliance on them makes for an overly formalistic method of interpretation. "Work" under the Fair Labor Standards Act, for example, may not be equivalent to "services required" or "job" under the Human Rights Act and its regulations when the divergent legislative contexts and purposes are taken into account. In this case, then, we must interpret the relevant terms with an awareness that the Legislature has declared that discrimination in employment "is contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." W. Va.Code 5–11–2; *see also Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E.2d 741 (1995). Thus, the statute, and particularly its language in § 5–11–9 defining unlawful discriminatory practices, must be read so as to maximize the chances of eliminating the prohibited biases from the spectrum of employment decisions. At the same time, we must not apply the law in such a way as to unduly restrict management discretion. *See United Steelworkers of America, AFL–CIO–CLC v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996). Considering those legislative purposes, and the context in which the disputed terms appear, I believe that "services required" and "job" should be determined by reference to the particular employment contract, *i.e.*, to what employers and employees believe to be are their respective obligations to each other. Such an interpretation would promote the Act's purposes and would facilitate application of the Act both by those it regulates and by those it protects.

Applying that approach, I find the Human Rights Act to apply to Mr. Hosaflook's termination from SCP. Consol has, in effect, said to its management personnel, if you become disabled *and* if you abide by our terms, we will pay you a salary for up to one year. Those terms become the job; and in this case that has meaning. While on Consol's SCP, an employee is required to do all that is necessary to recover from the injury suffered. This necessarily involves mental and physical exertion by the employee, e.g., keeping medical appointments, attending and taking part in physical and/or mental health therapy sessions. This is contrary to the majority's conclusion that being on SCP was a virtual state of vegetation. The majority laments that the employer does not control the activities or time of the employee that is on SCP. I disagree. The appellees have a vested interest in knowing whether an employee on SCP is moonlighting on another job or surfing on a California wave. *See Davenport v. Epperly*, 744 P.2d 1110 (Wy. 1987) (employee on salary continuance plan fired after being caught hunting). While on SCP, Mr. Hosaflook was not free to moonlight on another job; nor was he free to keep the appellees in the dark regarding his progress or lack of progress in recovering from his disability. *See Beauford v. Father Flanagan's Boys' Home*, 241 Neb. 16, 486 N.W.2d 854 (1992) (employee removed from salary continuance plan for failing to allow employer's physician to examine her). In other words, Mr. Hosaflook's time and activities were controlled by the appellees so long as he remained on SCP. Moreover, while the appellees may have kept Mr. Hosaflook listed as a foreman, he was to be paid as a member of SCP, i.e., his salary was in increments of a foreman's salary, not the full salary he would have received as a foreman. In the event that an employee was on SCP for a year and showed no signs of recovery from the disability, that employee's status would change to long term disability.[7] Thus, the SCP was part of the employment contract between Consol and Mr. Hosaflook, with responsibili-

---

**6.** Reliance on *Jewell Ridge* and *Tennessee Coal*, however, is rather questionable since Congress quickly overruled those decisions by enacting the Portal–to–Portal Act, 29 U.S.C. §§ 251–62. *See*

*Battaglia v. General Motors Corp.*, 169 F.2d 254, 255, 258 (2nd Cir.1948).

**7.** There is no question that Mr. Hosaflook was an "employee" within the meaning of the Act at the

ties on both sides. Mr. Hosaflook's responsibilities under that contract became, for the duration of his eligibility for SCP, the "services required" by the employer and thus constituted his "job." [8]

Two options confronted Mr. Hosaflook in terms of his future with Consol: (1) remaining on the short-term disability plan for a year and then switching to the long-term disability program, or (2) removal from the short-term disability program with reassignment to an above-ground position.[9] Both options were consistent with the terms or privileges of being on the short-term disability program. And both the circuit court and the majority have failed to consider that Mr. Hosaflook was "able and competent" to pursue either option.

Thus, Mr. Hosaflook stated a prima facie case: (1) he had a disability; (2) he was an employee qualified to continue under Consol's SCP and qualified, with accommodation, for above-ground employment; and (3) he was terminated. That, by itself, was enough to create an inference of discrimination, which, barring unequivocal and unrebutted evidence of a legitimate employer explanation for the termination, should have required the circuit court to reject the defendants' motion for summary judgment. Because the lower court held that Mr. Hosaflook was not a qualified person with a disability and could not invoke the statute's protections, it never reached the issue of whether the defendant had an unequivocal

and unrebutted explanation that defeated the prima facie case. Nevertheless, the majority has based its decision, in part, on the theory that there was no triable issue of fact on the question of discriminatory intent. I disagree with that conclusion, and thus feel compelled to explain why this case should go to trial.

The record includes evidence that bolsters the inference of discrimination created by the prima facie case, and that drew into question Consol's responsive explanation. As the majority explains, the appellees' justification for terminating Mr. Hosaflook was that their decision was based on foremen performance evaluations that were done for the period 1990–91. That evaluation period, however, coincided with the onset of Hosaflook's eye disease and thus resulted in a low, perhaps artificially low, performance score for him.[10] Nevertheless, when Consol learned of Mr. Hosaflook's handicap and of its impact on his performance evaluation score, it failed to reconsider the score's reliability as a measure of his competence and effort.

Depending upon the nature of their handicaps and employment, a substantial number of handicapped employees will not fare as well as their peers on performance evaluations unless reasonable accommodations were made for the effects of their handicap. In this case, no accommodation was made for Hosaflook during 1990–91 because neither he nor Consol were then aware of the need for it. According to Mr. Hosaflook, an employer

---

time of his discharge. After all, the case arose because Consol believed it had to reduce the number of its employees. It would be odd, indeed, for a reduction in force to be accomplished by laying off individuals who were no longer employees.

8. As the preceding discussion makes clear, I would find that the responsibilities and limitations Consol imposes on its employees for them to receive SCP make it a "job," even under the majority's definition of that term.

9. Rather than accommodating Mr. Hosaflook's handicap by determining whether above-ground foreman duties were available, the appellees fired him. We recently held in Syllabus Point 4 of *Skaggs v. Elk Run Coal Company, Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996), that:

"If the employee cannot be accommodated in his or her current position, however it is re-

structured, then the employer must inform the employee of potential job opportunities within the company and, if requested, consider transferring the employee to fill the open position." Although it would not be surprising in a RIF context that there would not be any openings, the record here does not compel that conclusion. In any event, openings could have become available after the RIF and prior to the end of the Hosaflook's one year on SCP that he may have been, with accommodation, qualified to perform.

10. The evidence clearly established that Mr. Hosaflook did not have problems with his vision until around the time that he was promoted to foreman. Dr. Murray indicated in an affidavit "that the work problems Mr. Hosaflook experienced are consistent with the manifestation of [retinitis pigmentosa] symptoms."

who was not hostile to persons with disabilities would have reconsidered, or even rejected as unreliable, any evaluations done of him in 1990–91. Moreover, an employer who *was* hostile to persons with disabilities would seize on the opportunity to remove such individuals when presented with a facially neutral reason (the RIF + evaluations)—thus avoiding the costs of future accommodations and of other responsibilities commonly associated with the employment of such individuals. Had a reassessment of his work been performed, Mr. Hosaflook contends, it would have prompted a nondiscriminating employer to place him above the RIF cut-off line for discharge. Consequently, a reasonable trier of fact could conclude that the appellees purposefully eliminated him through the RIF because of his disability rather than continuing him on the SCP or accommodating his handicap in an above-ground position.

**11.** The Supreme Court defined the term "otherwise qualified" and discussed the importance of considering reasonable accommodations in determining whether a handicapped individual is otherwise qualified for the job in *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307, 321 n. 17 (1987):

"'An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.' *Southeastern Community College v. Davis*, 442 U.S. 397, 406 [99 S.Ct. 2361, 2367, 60 L.Ed.2d 980] (1979). In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question. 45 CFR Sec. 84.3(k) (1985). When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. Ibid. Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, *Southeastern Community College v. Davis*, 442 U.S., at 412 [99 S.Ct. at 2370], or requires 'a fundamental alteration in the nature of [the] program,'" *Id.*, at 410 [99 S.Ct. at 2369].

**12.** The second issue raised is whether Mr. Hosaflook's facts could support a cause of action for intentional infliction of emotional distress or the tort of outrage. The majority contends that, because Mr. Hosaflook was fired simultaneously with other salaried employees, there was nothing improper in the method of carrying out the termination. In my concurring opinion in *Hines v. Hills Department Stores, Inc.*, 193 W.Va. 91, 98,

In sum, Mr. Hosaflook is a handicapped person who was (1) given a job performance evaluation by the appellees at a time when he and they were unaware of his handicap; (2) the handicap manifested itself during the period that the evaluation covered; (3) the evaluation produced a score diminished by his handicap; and (4) the evaluation was neither disregarded nor reconsidered, but was instead used against him to effect his termination. Although Mr. Hosaflook could perform above ground, the appellees made no effort to determine if a vacancy existed to which Mr. Hosaflook could have been reassigned.[11] Although these facts do not inexorably lead to the inferences of discrimination that Mr. Hosaflook would have us draw, I do think they follow reasonably. Accordingly, I believe he should have his chance to convince a jury of his case.[12]

454 S.E.2d 385, 392 (1994) (per curiam), I pointed out that the essential elements of this cause of action are as follows:

"The four elements of the tort can be summarized as: (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it."
In my judgment, the facts of this case established sufficient evidence to forestall summary judgment on this cause of action.

The majority contends that the appellees had limited knowledge about Mr. Hosaflook's vision impairment prior to firing him, therefore, there was nothing "outrageous" about their conduct. The majority has narrowed the full force of the evidence to reach its conclusion. I read the evidence as fully showing that the appellees were aware of the severity of Mr. Hosaflook's eye impairment prior to terminating him. This is quite clear from the fact that he was placed on SCP. The totally unacceptable aspect surrounding the termination is that it came only a few days after Mr. Hosaflook was placed on SCP. This is the crux of the "outrage" in this case. Further, the evidence surrounding this matter was equally conflicting on both sides, with neither side having evidence any more persuasive than the other—this equipoised position is one of

APPENDIX THREE

December 10, 1996—Opinion on
First Rehearing—Plaintiff
Granted Relief

ALBRIGHT, J.:

This case is before us [13] on rehearing after we affirmed the ruling of the Circuit Court of Monongalia County granting the appellees a summary judgment and Justice Cleckley filed a vigorous dissent. Upon reconsideration, we are of the opinion that the judgment of the circuit court should be reversed for the reasons set forth below.

### FACTS

Appellant, David Hosaflook, began working for Consol in 1975 as an hourly employee at the Robinson Run Mine, which is an underground coal mine in Monongalia County, West Virginia. Mr. Hosaflook left the hourly work force in 1990 to accept the salaried position of section foreman. As a foreman, he was assigned to underground work at Robinson Run Mine. Mr. Hosaflook acknowledges that from the beginning he had difficulty performing the tasks required of supervisors. He asserts that the difficulties he encountered, which can be summarized as stumbling and bumping into things and problems with paperwork required by the job, resulted from a handicap, the gradual deterioration of his vision.

In August of 1991, Consol followed its annual practice of conducting performance evaluations of all salaried employees in the Northern West Virginia Region. Performance evaluations assessed a salaried employee's performance during the preceding year, in this instance, August 1, 1990, through July 31, 1991. Evaluations were used for merit pay raise purposes. Although a reduction in force at the mine central to this case occurred later, appellees assert that, at the time of the performance evaluations, a reduction in force was not being planned, and Mr. Hosaflook was not then considered a handicapped person.

When the 1991 performance evaluations were completed Mr. Hosaflook was one of the lowest ranked salaried employees at the Robinson Run Mine, due in large measure to the difficulties he had been encountering as a result of what was later identified as the deterioration in his vision. His total score on the evaluation was 99 out of a possible 160.

In November, 1991, Mr. Hosaflook began to recognize that the difficulties he was experiencing arose from his vision problem. For a time, he kept the problem to himself. However, on February 5, 1992, he was diagnosed with retinitis pigmentosa (R.P.), which is a degenerative eye condition that eventually culminates in total and permanent blindness. Mr. Hosaflook claims he spoke to a supervisor, Denver Johnson, and a personnel officer, Mark Schiffbauer, and told them he had been diagnosed with R.P. and needed the name of a specialist to see regarding the diagnosis. Apparently he did not discuss the details and severity of the disease at that time. Consol contends that these inquiries regarding a specialist did not result in the company being aware of Mr. Hosaflook's disability at that time.

Appellees contend that a determination that a reduction in force among salaried employees at the mine was necessary was first made in early 1992 by Ronald Stovash, Consol's Vice–President of Fairmont Operations.[14] Eventually, it was determined that a total of twenty salaried positions would be eliminated at Robinson Run Mine. In early

the classic "material factual disputes" that inhibit summary judgment. "[S]ummary judgment is appropriate only if the record reveals no issue of material fact and the movant demonstrates an entitlement to judgment as a matter of law." *Powderidge Unit Owners Association v. Highland Properties, Ltd.*, 196 W.Va. 692, 698, 474 S.E.2d 872, 878 (1996), citing W.Va.R.Civ.P. 56(c).

**13.** The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honor-
able Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

**14.** A reduction of hourly employees occurred in August, 1991. At that time, a reduction of salaried employees was not being considered.

March, 1992, all salaried personnel at the mine were notified of the impending reduction at a meeting that Mr. Hosaflook attended. Prior to that meeting, Consol had ranked the salaried work force based on the 1991 performance evaluation scores, and the salaried employees were told at the meeting of Consol's intention to use the scores to select those to be discharged. Mr. Hosaflook's position as one of the lowest ranked foremen made his layoff a virtual certainty. At the meeting, it was explained that twenty individuals would be involuntarily laid off from the Robinson Run Mine unless there were enough volunteers for early retirement. Mr. Hosaflook concedes that the selection of persons to be included in the reduction in force was based on the evaluation scores, with possibly one exception.

On March 25, 1992, Mr. Hosaflook delivered to Consol a letter from his eye doctor, dated that same day, describing the severity of his vision problem. The letter stated Mr. Hosaflook could never work underground again and should be placed on long-term disability. The letter advised that the progression of the disease would lead to eventual blindness. Mr. Hosaflook was placed on Consol's Salary Continuance Program, a benefit program federally regulated under the Employee Retirement Income Security Act of 1975, 29 U.S.C. §§ 1001, *et seq.* (1974) (ERISA). The salary continuance program provided for incremental continuation of an employee's salary and benefits during periods of short-term illness and disability, in part as a bridge between the onset of disability and qualification for long-term disability benefits provided by Consol as an employment benefit. The salary continuance program, as adopted by Consol, expressly states that an employee on salary continuance remains subject to a reduction in force. Consol also treats employees on the salary continuance program as remaining on the work force for the site to which they were last assigned prior to the disability or illness giving rise to the use of the salary continuance program.

On April 1, 1992, the reduction in force was made. Under Consol's policies, the employment relationship between a salaried employee and the employer is terminated when a reduction in force is effected, and, pursuant to the express terms of the salary continuance program, separation by reason of a reduction in force also removes the employee from the salary continuance program. Incident to this reduction in force, Mr. Schiffbauer and Mr. Simpson met with Mr. Hosaflook to explain that he had been terminated, as a result of the reduction in force, due to job performance. Mr. Hosaflook and his wife, Kathryn Hosaflook, requested that he remain on the salary continuance program despite his termination. This message was relayed to Ronald Stovash, who had made the final determination to include Mr. Hosaflook in the force reduction. The request was denied.

The Hosaflooks, appellants here, filed this action in the Circuit Court of Monongalia County, alleging that Mr. Hosaflook's discharge constituted unlawful discrimination against a handicapped person and that the manner of discharge constituted the tort of outrage, from which Mr. Hosaflook suffers severe emotional distress.

Consol filed a motion for summary judgment, which the circuit court granted. The court's January 12, 1995 order states, "[p]laintiff filed this action alleging that he was wrongfully terminated in violation of the West Virginia Human Rights Act in that he contends that at the time of his discharge he was an otherwise qualified handicapped person. Additionally, the plaintiff contends that the facts surrounding his discharge were so outrageous that those facts constituted the tort of outrage." The court found that "[c]learly the doctor's diagnosis and prognosis demonstrate that the plaintiff could no longer safely perform the job for which he was hired after the onset of retinitis pigmentosa. Accordingly, under no circumstances could the plaintiff be considered a 'qualified handicapped person' at the time of his layoff on April 1, 1992." After discussing the difference between a claim for wrongful discharge and a claim for outrageous conduct, the court stated:

In this case no construction of the facts surrounding the implementation of the dis-

charge support a contention that the discharge was implemented in an outrageous manner. The plaintiff testified that he was called into an office, was told that he was being discharged, was advised of benefits available to him and nothing more. He was not singled out, embarrassed, threatened, verbally abused, ridiculed or humiliated.

As a consequence, appellants brought this appeal, and after our initial decision the parties again briefed and argued the matter before us.

## STANDARD OF REVIEW

The ultimate issue on appeal is whether the trial court appropriately granted summary judgment to Consol. This Court has stated that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Under Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment should be granted when the moving party shows there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law.

"In determining on review whether there is a genuine issue of material fact between the parties, this Court will construe the facts 'in a light most favorable to the losing party[.]' " *Alpine Property Owners Association, Inc., v. Mountaintop Development Company,* 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987) (*quoting Masinter v. WEBCO Co.,* 164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980)).

## SUBSTANTIVE ISSUES

We are of the opinion that appellant, David J. Hosaflook, may have been a "Qualified Individual with a Disability" who was "able and competent, with reasonable accommodation, to perform the essential functions of the job[.]" 6B W.Va.C.S.R. § 77–1–4.2; W.Va. Code § 5–11–9 (1992). Before rehearing, we had focused on appellant's claim, restated by his counsel at oral argument on rehearing, that Mr. Hosaflook's employment was that of

"salary continuance" and not section foreman.

This Court continues to believe that Mr. Hosaflook's employment at the time of his discharge was that of section foreman. It is undisputed that, under the terms of his employment, Mr. Hosaflook was expected to perform the usual duties of a section foreman *unless* he had qualified for and been awarded admission into the "salary continuance plan" offered by appellant. It is also undisputed that in the event Mr. Hosaflook qualified for the "salary continuance plan," he was entitled to salary continuance benefits for up to one year as one of the terms of his employment, unless he was discharged from his employment as a section foreman. The plan provided that if Mr. Hosaflook was discharged from his employment as a section foreman, his compensation from the salary continuation plan would end. Finally, during Mr. Hosaflook's time on the salary continuance plan, we perceive that his only duties included such things as keeping the employer advised of his condition and doing anything appropriate to improve his medical condition.

In support of their decision to terminate his employment, appellees rely entirely on Mr. Hosaflook's perceived inability to adequately perform the usual tasks of a section foreman. Specifically, they rely on a performance evaluation done some time before the decision was made to reduce the force at the mine where Mr. Hosaflook worked before going on salary continuance. Mr. Hosaflook's poor performance in that employment was both what qualified him for salary continuation and what caused the termination of his employment. In short, his eyesight condition, retinitis pigmentosa (R.P.), allowed him to be assigned to the salary continuation plan and is said to have interfered with his performance as a section foreman to such an extent that he received a low performance evaluation of his work in that position. Appellants acknowledge that under their internal systems, Mr. Hosaflook's place of employment continued to be considered as located at the mine, at which he no longer performed any services. In sum, we conclude that, at the time of his discharge, Mr. Hosaflook was employed as a section fore-

man at the mine where his performance was previously evaluated and that one of the terms of that employment was qualification for the salary continuation plan under certain circumstances which his eyesight problems satisfied.

We next confront the question of whether Mr. Hosaflook's termination from employment and consequent discontinuance in the salary continuation plan was discriminatory under the Human Rights Act. On the record before us, there is no dispute that the poor performance evaluation resulted from the eyesight problems. Therefore, on our review of the summary judgment rendered below, we indulge the inference that Mr. Hosaflook was discharged from his job as section foreman because of his eyesight problems, a handicapped condition under the Human Rights Act.[15] Since one of the terms of that employment was participation in the salary continuation plan and one of the results of the termination of Mr. Hosaflook's employment was the cessation of that participation, we believe that it may be readily concluded that the termination of employment because of the handicap resulted in discrimination in the terms of employment by reason of a handicap.

West Virginia Code § 5–11–3(h) (1994) states:

> The term "discriminate" or "discrimination" means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, handicap or familial status and includes to separate or segregate[.]

This Court has declared the necessary elements one must meet in order to establish a *prima facie* case of handicap discrimination pursuant to W.Va.Code § 5–11–9(*l* ):

> In order to establish a case of discriminatory discharge under *W. Va.Code,* 5–11–

9 [1989], with regard to employment because of a handicap, the complainant must prove as a prima facie case that (1) he or she meets the definition of "handicapped," (2) he or she is a "qualified handicapped person," and (3) he or she was discharged from his or her job.

*Morris Nursing Home v. Human Rights Commission,* 189 W.Va. 314, 318, 431 S.E.2d 353, 357 (1993).

In the case at bar, only the second element of this test is at issue. In applying the provisions of W.Va.Code § 5–11–9, a "Qualified Individual with a Disability" has been defined by regulation as "an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job[.]" 6B W.Va.C.S.R. § 77–1–4.2; W.Va.Code § 5–11–9 (1992). The impact of our conclusion is that at least for the remaining period for which Mr. Hosaflook qualified for the salary continuance plan, he was a qualified individual with a disability able to perform the essential functions required of the position as section foreman, which, in his case, required only participation in such salary continuance plan. Accordingly, his case survived summary judgment under those circumstances. Whether Mr. Hosaflook could show himself to be a "qualified individual" after the expiration of the salary continuance plan may be doubtful, but we leave that for development by the parties and further consideration by the trial court.

There remains the question of whether such discrimination was intentional. Intentional discrimination arises from "deliberately treating individuals differently because of different individual traits." *Guyan Valley Hospital, Inc. v. West Virginia Human Rights Commission,* 181 W.Va. 251, 253, 382 S.E.2d 88, 90 (1989). " 'Illegal discrimination' means treating individuals differently because of some individual trait that the law says can't legitimately be considered. Exam-

---

**15.** West Virginia Code § 5–11–3(m) (1994), defines handicap as follows:

The term "handicap" means a person who:

(1) Has a mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as car-

ing for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;

(2) Has a record of such impairment; or

(3) Is regarded as having such an impairment.

ples of such traits are race, age, sex, and handicap." *Id.*

We understand the claim of appellees to be that the employer was unaware of the eyesight problem at the time the discharge decision was made and announced and that appellants contend otherwise. Again, on review of summary judgment, we treat the facts in the light most favorable to the non-movant. Accordingly, we conclude on the record before us that appellants may make out a *prima facie* case of intentional discrimination upon the evidence they propose to adduce.

Next appellees assert that we are barred by the doctrine of pre-emption from permitting West Virginia courts to consider a claim based on discrimination in the salary continuation plan because such a claim is controlled solely by federal law under the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (1974) (ERISA). Indeed on oral argument, we understood appellees to concede that the discharge of Mr. Hosaflook under the circumstances he asserts occurred and the consequent discontinuation of the salary continuation plan would make out a claim under our Human Rights Act but for pre-emption flowing from ERISA. Consistent with that position, appellees said in their rehearing brief:

> Accordingly, if a black employee presented evidence that he was discharged because of race while receiving salary continuance, that employee would unquestionably state a *prima facie* case of race discrimination.

We believe that the ERISA pre-emption issue is governed by the principles stated by the United States Supreme Court in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that the Act "shall supersede any and all State laws insofar as they ... relate to any employee benefit plan[.]" In *Shaw,* the employers contended that § 514(a) pre-empted a state human rights law that said pregnancy must be included in the conditions covered by medical benefits plans. The Court agreed with the employers that the human rights

law "related to" a benefits plan within the meaning of § 514(a) and that it was, therefore, pre-empted unless the state law came within one of the exceptions. The Court concluded that the state law came within the exception of § 514(d) of the Act, which provides that the pre-emption clause in subsection (a) shall not "be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." The Court then referred to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (1964), which prohibits (*inter alia*) discrimination in employment on the basis of pregnancy. Id., 701(k), 42 U.S.C.2000e(k). The Act also establishes an enforcement scheme that mandates deferral to state anti-discrimination agencies and laws. 706(c), 708, 42 U.S.C.2000e-5 and 2000e-7. The *Shaw* Court thus concluded that an ERISA pre-emption of all state laws regulating discrimination in benefits plans would, in fact, impair the operation of Title VII. Accordingly, the Court held that ERISA does not pre-empt state anti-discrimination laws insofar as they prohibit conduct that is also prohibited by Title VII. Such state laws are, however, pre-empted to the extent that they prohibit conduct that is not also prohibited by Title VII.

The case at bar concerns disability discrimination, which is not governed by Title VII, but by the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* (1990). Nevertheless, we concluded that Shaw's reasoning and holding control here because the ADA uses precisely the same enforcement scheme as Title VII, with mandated deferral to state agencies. Section 107(a), 42 U.S.C. 12117(a) states:

> The powers, remedies, and procedures set forth in Sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

Thus, if the allegedly discriminatory conduct in this case is prohibited by the ADA, then

ERISA does not pre-empt our Human Rights Act's prohibition of the same. Appellant alleges he was discharged because of his disability, conduct which clearly violates the ADA. The term "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 102(b), § 42 U.S.C. 12112(b)(4). Even if appellant's case is characterized as discrimination against a person with a disability in the administration of the salary continuance plan, that exclusion from a benefit is "discrimination" that is barred by the ADA. *Id. See Arizona Governing Comm. v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983); *Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). As a result, we believe that the discrimination claim in this case is not pre-empted by ERISA.

Accordingly, we believe it necessary to reverse the judgment of the lower court and remand this matter for further proceedings, including trial. We are advised that Mr. Hosaflook has received disability benefits from or through his employer because of his eyesight problems. Since it is not clear on the present record that Mr. Hosaflook could have been a "qualified individual" after the period of salary continuation, the discrimination in this case may be limited by the period of time between discharge and the expiration of the salary continuance plan. Nevertheless, we conclude for the reasons stated that appellants ought to have the opportunity to pursue their discrimination claim so the outcome will be determined.

Appellants also asserted a claim for the tort of outrage which was rejected by the lower court when summary judgment was granted below. A claim for wrongful discharge and a claim for the tort of outrage may both exist in an employment-related case. However, the claims differ and are indeed separate claims. This Court distinguished between the two claims in syllabus point 2 of *Dzinglski v. Weirton Steel Corp.,*

191 W.Va. 278, 445 S.E.2d 219 (1994), which states:

> The prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach. When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on the validity of the employer's motivation or reason for the discharge. Therefore, any other conduct that surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.

The tort of outrage was first defined by this Court in syllabus point 6 of *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982), which states:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Justice Cleckley enlarged on the definition of outrage and summarized the four elements of the tort in his concurrence in *Hines v. Hills Department Stores, Inc.,* 193 W.Va. 91, 98, 454 S.E.2d 385, 392 (1994) (per curiam), as follows:

> The four elements of the tort can be summarized as: (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer

emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Given our reconsideration of appellant's claim of discrimination under the Human Rights Act and the principles upon which we have based that reconsideration, we are of the opinion that upon trial sufficient evidence may be adduced to permit this cause to go to the jury. We note that the issue of whether the discharge of Mr. Hosaflook was intentional and the award of benefits shortly after the discharge may well be the controlling factors in that determination. Those other factors suggest that the trial court may once again, at an appropriate stage in the proceedings, determine that the claim of outrage is not sustained by the evidence. However, since we have reversed the summary judgment regarding the discrimination claim and have announced applicable principles with respect to that claim which may impact the full and fair development of the outrage claim, we believe the matter of the validity of the claim for outrage is best committed at this time to further review by the trial court.

Accordingly, we reverse the judgment of the circuit court granting summary judgment on the claim of outrage and remand for such further proceedings as the law and the evidence may justify.

Reversed and remanded.